Raul Adam **MARTINEZ, Jr.,** Appellant,

v.

**The STATE of Texas,** Appellee.

**No. 13–03–388–CR.**

Court of Appeals of Texas,
Corpus Christi–Edinburg.

Nov. 9, 2006.

Frances Northcutt, Attorney At Law, Houston, for Appellant.

Eric Kugler, Assistant District Atty., William J. Delmore, III, Chief Prosecutor, Appellate Div., Houston, for Appellee.

Before Chief Justice VALDEZ and Justices YANEZ and CASTILLO.

## OPINION

Opinion by Chief Justice VALDEZ.

Appellant, Raul Adam Martinez, Jr., was convicted of capital murder and sentenced to life in prison. Martinez contends the trial court made a constitutional error by denying his motion to suppress a videotaped statement he made to police. The sole point of error on appeal is that Martinez's videotaped statement should not have been admitted into evidence at trial because it was made during an interrogation that began without *Miranda* warnings, even though Martinez was given the appropriate warnings just prior to making the statement. Appellee, the State, responds that: (1) Martinez has not met the burden of presenting and developing a record to show error requiring reversal; (2) neither a substantive interrogation nor an incriminating statement occurred before Martinez voluntarily waived his constitutional rights by making the statement; and (3) Martinez was not harmed by the admission of his videotaped statement. We affirm the trial court's judgment.

## I. BACKGROUND

### A. Factual Background

Martinez was arrested by Officer Macario Sosa for the capital murder of Manuel Arriaga–Molina. During the arrest, Sosa handcuffed Martinez, told him he was under arrest for capital murder, placed him in a police car, and drove him to the police station. No *Miranda* warnings were given at the scene of the arrest or at the police station. Upon arriving at the police station, Sosa and his partner, Sergeant Hernandez, asked Martinez if he wanted to speak with them about the incident. The three briefly discussed the incident, but Martinez denied knowing anything about it.

Shortly after his brief discussion with the officers, Martinez was turned over to another officer, who administered a polygraph test. It took the polygrapher three to four hours to create the test questions from the case file and administer the test. The record does not contain the questions asked during the test or a report of the test. Martinez was then returned to Officers Sosa and Hernandez and allowed to use the bathroom, telephone his father, and eat. At this point, Officers Sosa and Hernandez confronted Martinez with the fact that areas of deception had been detected during the polygraph test. They then took Martinez from the police station to a municipal court, where he was given his statutory and constitutional warnings by a magistrate. From municipal court, Martinez was taken to a different police station and placed in an interrogation room. Finally, Officers Sosa and Hernandez sat down with Martinez, gave him *Miranda* warnings, and questioned him; the interrogation was videotaped.

### B. Procedural Background

A suppression hearing to determine the admissibility of Martinez's videotaped statement was held shortly before trial; Officer Sosa was the only witness. Officer Sosa described the aforementioned arrest and interrogation process. Martinez's defense counsel highlighted the fact that during his recorded statement, Martinez made two references to statements he was told by another officer. The statements were made when Officers Sosa and Hernandez conveyed the gravity of the situation by reminding Martinez that three people were shot and one was killed. Martinez casually pointed to the wall and responded,

"[t]hat's what the dude told me over there." Officer Sosa testified that Martinez was referring to the polygraph examiner. A record was not created of the questions, statements, or results of the polygraph examination. The trial court denied Martinez's motion to suppress his videotaped statement.

## II. DISCUSSION

Martinez contends that his videotaped confession was the product of a type of "question-first" interrogation made unconstitutional by the U.S. Supreme Court.[1] Martinez argues that the unwarned and warned portions of the interviews were done as part of a tactically continuous process aimed at getting him to make admissions before he was aware of his legal rights. He asks us to apply the Fifth Amendment analysis used in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). *See* U.S. CONST. amend V.

### A. The *Seibert* Case

The *Seibert* case involved murder and questionable police conduct. Patrice Seibert's 12–year–old son, Jonathan, had cerebral palsy, and when he died in his sleep, she feared charges of neglect because of bedsores on his body. She allowed her other son and a friend to "torch" her mobile home while Jonathan's body and Donald, a mentally ill teenager staying with Seibert, were inside. Donald was left inside the home to avoid any appearance that Jonathan had been unattended. When the local police arrested Seibert, they intentionally questioned her without

*Miranda* warnings for 30 to 40 minutes. During the questioning, an officer squeezed Seibert's arm and repeated, "Donald was also to die in his sleep." After Seibert admitted she knew Donald was meant to die in the fire, she was given a 20–minute coffee and cigarette break. She was then returned to the same room by the same officer, given *Miranda* warnings, and waived those warnings. The questioning during this session began, "Ok, 'trice, we've been talking for a little while about what happened...."

Seibert was charged with first-degree murder for her role in Donald's death. At a suppression hearing before trial, she sought to exclude both her pre-warning and post-warning statements. The trial court excluded only her pre-warning statements and she was convicted of second-degree murder. On appeal, the U.S. Supreme Court, in a plurality opinion, affirmed.

Justice Souter's opinion, which was joined by three other Justices, held that "[t]he threshold issue when interrogators question first and warn later is ... whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Seibert*, 542 U.S. at 611–12, 124 S.Ct. 2601. Any *Miranda* warning "inserted in the midst of [a] coordinated and continuing interrogation" is problematic; and unless "a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, [and thus] the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admis-

1. *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), was handed-down a few days after Martinez filed his brief. Martinez's brief relies upon *State v. Seibert*, 93 S.W.3d 700 (Mo.2002), *cert. granted* 538 U.S. 1031, 123 S.Ct. 2091, 155 L.Ed.2d 1059 (2003). No supplemental brief was filed after the Supreme Court handed-down its opinion.

sion," the plurality would find the postwarning statements inadmissible. *Id.* at 614–16. The plurality set forth five "relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective:"

> [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615, 124 S.Ct. 2601. These factors, all of which concern the relationship between the first and second interrogations, are intended to aid courts in determining whether an initial, unwarned interrogation operates to "thwart *Miranda's* purpose of reducing the risk that a coerced confession would be admitted." *Id.* at 617, 124 S.Ct. 2601.

Justice Kennedy concurred in the judgment, but on "narrower" grounds. *Id.* at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in judgment only). Like the plurality, Justice Kennedy wrote that "[t]he interrogation technique used in this case is designed to circumvent *Miranda v. Arizona*," and "statements obtained through the use of this technique are inadmissible." *Id.* at 618, 124 S.Ct. 2601. For Justice Kennedy, however, the plurality's test,

which "envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations, ... cuts too broadly." *Id.* at 621–22, 124 S.Ct. 2601. Instead, in Justice Kennedy's view, unless the police used "the two-step interrogation technique ..." in a calculated way to undermine the *Miranda* warning, then "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad.*" [2] *Id.* at 622, 124 S.Ct. 2601. In those "infrequent case[s]" where the interrogating officer deliberately uses the two-step strategy, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.* If the two-step method was used deliberately, the interrogating officer must take "curative measures ... designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning," such as "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning," or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Id.*

Justice O'Connor authored the four-member dissent, which concluded that "the plurality gives insufficient deference to *Elstad,*" and stated that the Court should have "analyze[d] the two-step interroga-

---

2. *Oregon v. Elstad,* 470 U.S. 298, 301, 314–16, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In *Elstad,* the police went to a young suspect's house to take him into custody on a charge of burglary. *Id.* One officer spoke with the mother in the kitchen, while another briefly waited with the suspect in the living room. The officer in the living room told the young man he "felt" he was involved in the burglary. The young man acknowledged being at the scene. At the outset of the interrogation at the police station, the suspect was given *Miranda* warnings and made a full confession. The Court held the second statement admissible and voluntary and rejected the "cat out of the bag" theory that any short, earlier admission obtained in arguably innocent neglect of Miranda determined the character of the later, warned confession. *Id.* at 311–14, 105 S.Ct. 1285.

tion procedure under the voluntariness standards central to the Fifth Amendment and reiterated in *Elstad.*" *Id.* at 628–29, 124 S.Ct. 2601 (O'Connor, J., dissenting).

## B. The Holding Under *Seibert*

■ Under *Miranda,* police officers are required to inform individuals about to undergo custodial interrogation that the state intends to use their statements to convict them, that they have the right to remain silent, and that they have the right to have counsel present during questioning. *Miranda,* 384 U.S. at 468–70, 86 S.Ct. 1602. An individual may effectively waive these rights "provided the waiver is made voluntarily, knowingly, and intelligently." *Id.* at 444, 475, 86 S.Ct. 1602. In order for the waiver to be made voluntarily, it "must have been made with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

Our reading of *Seibert* is that a confession is voluntarily made if it is made after proper and functional *Miranda* warnings. *See Seibert,* 542 U.S. at 612, 124 S.Ct. 2601 (plurality opinion). *Seibert* deals with the admissibility of statements made after the police give "midstream" warnings, that is, when police begin a custodial interrogation without advising the suspect of his *Miranda* rights, obtain incriminating statements, and then continue questioning after administering warnings in order to re-elicit the incriminating statements. *Id.* The plurality opinion holds that "when interrogators question first and warn later," the threshold issue is "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Id.* at 611–12, 124 S.Ct. 2601.

The dissent aptly points out that the holding of a plurality decision is usually found in the opinion that concurs in the judgment on the narrowest grounds. *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (holding that ordinarily, where "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (internal quotation marks omitted)); *see also Thornton v. State,* 145 S.W.3d 228, 234 n. 10 (Tex.Crim.App.2004).

However, the dissent fails to recognize the practical limitations of *Marks.* The *Marks* rule produces a determinate holding only when one opinion is a logical subset of other, broader opinions. *United States v. Eckford,* 910 F.2d 216, 219 n. 8 (5th Cir.1990) ("The *Marks* 'narrowest grounds' interpretation of plurality decisions comprehends a least common denominator upon which all of the justices of the majority can agree."); *King v. Palmer,* 950 F.2d 771, 781 (D.C.Cir.1991) (en banc). When the plurality and concurring opinions take distinct approaches, and there is no narrowest opinion representing the common denominator of the Court's reasoning, *Marks* becomes problematic. *United States v. Carrizales–Toledo,* 454 F.3d 1142, 1151 (10th Cir.2006). *Marks* does not apply when the various opinions supporting the Court's decision are mutually exclusive. *See Homeward Bound, Inc. v. Hissom Mem'l Ctr.,* 963 F.2d 1352, 1359 (10th Cir.1992) (*citing King,* 950 F.2d at 782).

We find the holding in *Seibert* to be in the plurality opinion for two reasons. First, there is no internal rule tethering

the plurality and concurrence in judgment. *See* Ken Kimura, *A Legitimacy Model for the Interpretation of Plurality Decisions,* 77 Cornell L.Rev. 1593, 1599–1600 (1992).[3] The plurality's rationale focuses on the defendant's comprehension of his rights during the interrogation process. *Seibert,* 542 U.S. at 613–14, 124 S.Ct. 2601 ( "[W]hen *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.' ") (quoting *Moran v. Burbine,* 475 U.S. 412, 424, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). The plurality's reasoning fits within the framework surrounding *Miranda. See Duckworth v. Eagan,* 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989); *California v. Prysock,* 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981). By contrast, Justice Kennedy's concurrence focuses on the state-of-mind of the interrogating officers, drawing a distinctions between accidental and intentional actions. It urges the appli-

cation of *Elstad* unless a deliberate two-step strategy is used; if the deliberate two-step strategy is used, curative measures must be employed before the post-warning statement is made in order for that statement to be admissible. *Seibert,* 542 U.S. at 621, 124 S.Ct. 2601 (Kennedy, J., concurring in judgment only).

Furthermore, not only was *Seibert's* concurrence the decision of only one (or arguably two) Justice(s), but it was expressly rejected by seven other Justices of the Supreme Court.[4] The plurality argued that, "[b]ecause intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation), the focus is on facts apart from the intent that show the question first tactic at work." *Id.* at 617 n. 6, 124 S.Ct. 2601. Justice O'Connor's rebuff is even more stinging. Justice O'Connor claimed that Justice Kennedy's rationale creates ambiguity in analyzing two-stage interrogation cases because, "in addition to addressing the standard *Miranda* and voluntariness questions, courts

**3.** Ascertaining the appropriate legal rule requires a close analysis of the plurality opinion and Justice Kennedy's concurring opinion. For,

[a]lthough the narrower legal rule may share certain aspects of the broader legal rule, it does not necessarily follow that the Justices supporting the broader rule accept the validity of the narrower rule. Indeed, the fact that the decision creates a split concurrence suggests that some Justices do not accept the validity of the narrower rule. To construe the narrower legal rule as the majority rule is misguided. It is true that the coalition of Justices supporting the broader rule would necessarily reach the same outcome under the narrower rule. This seems to suggest that this coalition implicitly accepts the narrower rule. However, in future decisions, the coalition supporting the broader rule will "implicitly" agree with the narrower rule only on those

occasions when the same particular outcome is achieved. When the alternative outcome results, no basis exists for believing that the Justices supporting the broader rule will still accept the principles underlying the narrower rule. This one-way flow of legitimacy disallows imputing a majority agreement on the narrower rule.

Ken Kimura, A Legitimacy Model for the Interpretation of Plurality Decisions, 77 Cornell L.Rev., 1593, 1604 (1992).

**4.** Justice Breyer joined in Justice Souter's plurality entirely; he also wrote his own concurrence that partially joins Justice Kenney's concurrence, but articulates a slightly different rule in that, "[c]ourts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith." *Seibert,* 542 U.S. at 617, 124 S.Ct. 2601 (Breyer, J., concurring).

will be forced to conduct the kind of difficult, state-of-mind inquiry that we normally take pains to avoid." *Id.* at 627, 124 S.Ct. 2601 (O'Connor, J., dissenting).

The underlying rationales of Justice Kennedy's concurrence and the plurality opinion are so divergent that they render *Marks's* narrowest-grounds-interpretation rule inapplicable. Generally, the narrowest ground merits only persuasive precedential value, Kimura, 77 Cornell L.Rev. at 1617, not mandatory precedential value. Because Justice Kennedy's concurrence is clearly a minority view and does not comport with the jurisprudence surrounding *Miranda*, we find the plurality opinion is more persuasive and therefore governs.[5]

## C. Response to the Dissent

In applying Justice Kennedy's holding, the dissent summarily finds deliberate two-stage intent in either a failure to make a record of pre-*Miranda* statements or the very act of engaging in "two-stage" interrogation. The dissent fails to perform an *Elstad* analysis of whether the officer's omission of *Miranda* warnings was "a simple failure to administer the warning, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will." *Elstad,* 470 U.S. at 318, n. 5, 105 S.Ct. 1285. The dissent's inability to successfully conduct an *Elstad* inquiry exposes the practical problems of applying the rule dictated by Justice Kenney's concurrence in *Seibert.* As noted in Justice O'Connor's dissent, evidentiary difficulties

have led the Supreme Court to reject an intent-based test in several criminal procedures. *Seibert,* 542 U.S. at 626, 124 S.Ct. 2601. (*citing New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)). Unlike *Seibert,* Officer Sosa did not own up to a deliberate two-stage interrogation. The silent record in the instant case does not reveal "any actual coercion or other circumstances calculated to undermine" Martinez's ability to exercise his free will.

The dissent cites *Jones v. State,* 119 S.W.3d 766 (Tex.Crim.App.2003), as authority condemning two-stage interrogation. *Jones* was published a year before *Seibert* was decided, dealt with facts equally as disturbing as *Seibert,* and is distinguishable from Martinez's case. In *Jones,* appellant orally admitted his involvement in two murders. *Id.* at 771–72. As appellant confessed, an officer wrote down "verbatim" what appellant said on a statement form. *Id.* When appellant finished, the officer sat down next to him and went over the legal rights that appeared at the top of the written form. *Id.* Then the officer and appellant read the statement together, appellant corrected mistakes, initialed revisions, and signed the statement at the bottom. *Id.*

The dissent's reliance on *Jones* is misplaced. The facts in *Jones* were so egregious that the Court of Criminal Appeals rested its opinion on *Miranda.* It refused to apply *Elstad*—the only other doctrinal tool available at the time—because "[t]o apply *Elstad* here and declare the [appel-

---

**5.** We are mindful that the U.S. Court of Appeals for the Fifth Circuit has recently issued two unpublished opinions finding *Seibert's* holding in Justice Kennedy's concurrence. *See, e.g., United States v. Courtney,* No. 05–30156, 2006 U.S. LEXIS 21965, at *11 (5th Cir. Aug. 20, 2006) (unpublished opinion)

*United States v. Hernandez,* No. 05–20158, 2006 WL 2602078, at *2, 2006 U.S.App. LEXIS 23250, at *7, n. 1 (5th Cir. Sept. 12, 2006) (per curiam) (unpublished opinion). Perhaps the Fifth Circuit can find an internal rule coursing through the plurality and Justice Kennedy's concurrence that we cannot.

lant's] statement admissible by virtue of the late admonishment of the required warnings would undermine the spirit and intent of *Miranda*." *Id.* at 775. *Seibert* is now the law of the land and provides an appropriate analysis given the facts of the instant case. Martinez's rights were not trampled like those of the appellant in *Jones*. The instant case shows a meaningful waiver of *Miranda* because the questioning was not continuous. To the contrary, the officers' questions were punctuated by a trip to a municipal court, where Martinez was given *Miranda* warnings by a magistrate.

### D. Standard of Review

 Motions to suppress are subject to a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim.App.2000). In reviewing the trial court's ruling on a motion to suppress, we afford deference to the trial court's determination of the historical facts and rulings on mixed questions of law and fact if the resolution of those questions turns upon the credibility and demeanor of witnesses. *Guzman v. State*, 955 S.W.2d 85, 87–88 (Tex.Crim.App.1997); *Morfin v. State*, 34 S.W.3d 664, 666 (Tex.App.-San Antonio 2000, no pet.). Appellate courts are not at liberty to disturb the trial court's findings of fact as long as they are supported by the record. However, we decide *de novo* whether the trial court erred in misapplying the law to the facts. *Carmouche*, 10 S.W.3d at 327; *Guzman*, 955 S.W.2d at 87–88; *Morfin*, 34 S.W.3d at 666.

### E. Analysis

 The instant case presents a *Seibert* problem because Martinez made pre-*Miranda* statements to police officers and a polygraph examiner, was then given sepa-rate *Miranda* warnings by a magistrate and the interrogating officers, and finally appeared in a videotaped interrogation that was admitted into evidence at trial.

At the outset, we note that there is no record of Martinez's pre-warning statements made to Officers Sosa and Hernandez or the polygraph examiner. The first two factors that the *Seibert* plurality found relevant in determining whether *Miranda* warnings delivered midstream are effective are the completeness and detail of the questions and answers in the first round of interrogation and the overlapping content of the two statements. The dissent is troubled by Martinez's two references to the polygrapher telling him that three people were shot during the incident. Unlike *Seibert*, Martinez was repeating the polygrapher's general statements regarding the crime, not his own unwarned statements. Therefore, the first two *Seibert* factors are not applicable in Martinez's case.

In this case, the last three *Seibert* factors point toward a meaningful waiver of Martinez's right to remain silent. The timing, setting, and general circumstances surrounding the second interrogation were formal enough to apprise Martinez of the gravity of the situation. Shortly after the polygraph test was administered, Martinez was given *Miranda* warnings by a magistrate and then taken to a different police station for further interrogation. Before the post-warning interrogation, Martinez was apprised of his rights by Officer Sosa. Having been given *Miranda* warnings by a magistrate and Officer Sosa, Martinez made the videotaped statement. While Officers Sosa and Hernandez interacted with Martinez before and after the *Miranda* warnings, their questions did not rely on statements made prior to the warnings.

## III. CONCLUSION

We conclude that admission of the video-taped statement did not constitute constitutional error because it was made after a proper and functional *Miranda* warning. Martinez's sole point of error is overruled. The judgment of the trial court is affirmed.

Dissenting opinion by Justice LINDA REYNA YAÑEZ.

Dissenting Opinion by Justice YAÑEZ.

I agree with the majority that the United States Supreme Court's decision in *Missouri v. Seibert* is applicable to this case.[1] I disagree, however, with the majority's application of *Seibert* and its conclusion that the trial court did not err in admitting appellant's videotaped statement. I would hold that appellant's statement was obtained pursuant to a deliberate two-step interrogation technique used to undermine the effectiveness of *Miranda* warnings,[2] and that the statement is therefore inadmissible. Because I cannot conclude beyond a reasonable doubt that the statement did not contribute to appellant's conviction, I would also hold that the error was harmful.[3] I would sustain appellant's issue, reverse his conviction, and remand to the trial court for a new trial. Accordingly, I respectfully dissent.

In a single issue, appellant contends the trial court erred in admitting his post-*Miranda* videotaped statement because his "initial interrogation," prior to receiving *Miranda* warnings, tainted his warned statement and rendered it involuntary. Appellant contends he was subjected to an "unwarned interrogation process, including . . . polygraphing," which was used to obtain admissions from him before he was apprised of his rights. Appellant argues that the warned and unwarned portions of his interviews were "part of one continuous process," and that his warned statement was therefore involuntary and inadmissible.

In response, the State argues that (1) appellant was not interrogated and gave no incriminating statement prior to waiving his constitutional rights, and (2) the admission of appellant's statement was harmless in light of other evidence of his guilt. I conclude that by subjecting appellant to a polygraph examination that included questions about the crime for which he was arrested, without first giving him *Miranda* warnings, law enforcement officers deliberately utilized a two-step interrogation technique that undermined appellant's subsequent *Miranda* warnings and rendered his videotaped statement inadmissible.

### Standard of Review and Applicable Law

A trial court's ruling on a motion to suppress is generally reviewed for abuse of discretion.[4] In a suppression hearing, the trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given to their testi-

---

1. *Missouri v. Seibert*, 542 U.S. 600, 616–17, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).

2. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. *See* TEX.R.APP. P. 44.2(a).

4. *See Ford v. State*, 26 S.W.3d 669, 672 (Tex. App.-Corpus Christi 2000, no pet.) (citing *Oles v. State*, 993 S.W.2d 103, 106 (Tex.Crim.App. 1999)).

mony.[5] In reviewing a trial court's ruling on a motion to suppress, we afford almost total deference to the trial court's determination of the historical facts that the record supports, especially when the trial court's findings turn on evaluating a witness's credibility and demeanor.[6] When, as in this case, the trial court makes no explicit findings of historical fact, we presume it made those findings necessary to support its ruling, provided they are supported in the record.[7] We afford almost total deference to the trial court's ruling on "application of law to fact questions," also known as "mixed questions of law and fact," if resolving those ultimate questions turns on evaluating credibility and demeanor.[8] We review *de novo* questions of law and "mixed questions of law and fact" that do not turn on an evaluation of credibility and demeanor.[9] We uphold a trial court's ruling on a suppression motion if it is reasonably supported by the record and is correct on any theory of law applicable to the case.[10]

The safeguards established in *Miranda* come into play when a person in custody is subjected to either express questioning or its functional equivalent.[11] A confession may be deemed "involuntary" under three different theories: (1) failure to comply with article 38.22;[12] (2) failure to comply with the dictates of *Miranda;* or (3) failure to comply with due process or due course of law because the confession was not freely given as a result of coercion, improper influences, or incompetency.[13] When a defendant challenges the voluntariness of a confession, the burden is on the government to show that a waiver of *Miranda* rights was the result of a defendant's own free and rational choice in the totality of the circumstances.[14]

---

5. *State v. Ballard,* 987 S.W.2d 889, 891 (Tex. Crim.App.1999).

6. *State v. Ross,* 32 S.W.3d 853, 856 (Tex.Crim. App.2000); *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997).

7. *See Carmouche v. State,* 10 S.W.3d 323, 327–28 (Tex.Crim.App.2000). The trial court did not file written fact findings and conclusions of law regarding the voluntariness of appellant's statement as required by article 38.22, section 6 of the code of criminal procedure. *See* Tex.Code Crim. Proc. Ann. art. 38.22 § 6 (Vernon 2005); *Urias v. State,* 155 S.W.3d 141, 143 (Tex.Crim.App.2004). However, the trial court complied with article 38.22, section 6, by dictating its findings and conclusions to the court reporter, and those findings are part of the appellate record. *See Murphy v. State,* 112 S.W.3d 592, 601 (Tex.Crim.App. 2003). The trial court's findings were:

I am going to admit the statement. I make a specific finding I have found Officer Sosa to be a credible witness. The arrest warrant is a good arrest warrant. It appeared that the defendant did freely, voluntarily and knowingly waive his rights to remain silent and give that statement. There was no testimony of any threats. The behavior of Officer Sosa appears to be exemplary and it is admitted.

8. *Ross,* 32 S.W.3d at 856; *Guzman,* 955 S.W.2d at 89.

9. *Ross,* 32 S.W.3d at 856; *Guzman,* 955 S.W.2d at 89.

10. *Villarreal v. State,* 935 S.W.2d 134, 138 (Tex.Crim.App.1996).

11. *Miller v. State,* 196 S.W.3d 256, 266 (Tex. App.-Fort Worth 2006, no pet. h.) (citing *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)).

12. *See* Tex.Code Crim. Proc. art. 38.22 (Vernon 2005).

13. *Miller,* 196 S.W.3d at 266 (citing *Wolfe v. State,* 917 S.W.2d 270, 282 (Tex.Crim.App. 1996)).

14. *United States v. Hernandez,* No. 05–20158, 2006 WL 2602078, at *4, 2006 U.S.App. LEXIS 23258, at *12 (5th Cir. Sept. 12, 2006) (per curiam) (citing *Colorado v. Connelly,* 479 U.S.

The Texas Court of Criminal Appeals has held that a trial court's erroneous admission of a defendant's statement in violation of the Fifth Amendment is federal constitutional error subject to a harm analysis under Texas Rule of Appellate Procedure 44.2(a).[15] Under rule 44.2(a), a judgment of conviction or punishment must be reversed unless the reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.[16] Error in admitting an appellant's statement is not harmless beyond a reasonable doubt if there is a reasonable likelihood that the error materially affected the jury's deliberations.[17] Thus, a reviewing court should "calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence."[18]

### Analysis

Appellant argues that his post-*Miranda* statement is inadmissible because his unwarned and warned statements were "one continuous process." Appellant cites *Jones v. State*, 119 S.W.3d 766, 775 (Tex. Crim.App.2003) and *Missouri v. Seibert*, 542 U.S. 600, 616–17, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), in support of his argument.[19]

The majority applies the multi-factor test crafted by the four-justice plurality in *Seibert* and concludes that under the circumstances, appellant's pre-statement *Miranda* warnings effectively apprised him of his rights and rendered his statement admissible.[20] As noted, I agree that *Seibert* is applicable, but disagree with the majority's application of *Seibert* and its conclusion. Under the holding in *Seibert*, the threshold issue is whether the officers deliberately engaged in a two-step procedure to weaken *Miranda's* protections.[21] By subjecting appellant to a polygraph examination that included questions about the

157, 163–65, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *United States v. Bell*, 367 F.3d 452, 461 (5th Cir.2004)); *Miller*, 196 S.W.3d at 266 (citing *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex.Crim.App.1995)).

**15.** *See* Tex R.App. Proc. 44.2(a); *Jones v. State*, 119 S.W.3d 766, 777 (Tex.Crim.App.2003); *McCarthy v. State*, 65 S.W.3d 47, 55 (Tex. Crim.App.2001); *Valerio v. State*, No. 13–03–243–CR, 2004 Tex.App. LEXIS 11049, at *10–*11 (Tex.App.-Corpus Christi 2004, pet. ref'd) (not designated for publication).

**16.** *Jones*, 119 S.W.3d at 777; *McCarthy*, 65 S.W.3d at 52.

**17.** *Jones*, 119 S.W.3d at 777; *McCarthy*, 65 S.W.3d at 55.

**18.** *Jones*, 119 S.W.3d at 777 (quoting *McCarthy*, 65 S.W.3d at 55); *see United States v. Polanco*, 93 F.3d 555, 562–63 (9th Cir.1996) (analyzing *Miranda–Elstad* error and finding it harmless because of "substantial other evidence" to prove the same fact as that contained within the defendant's improperly admitted statement); *Harryman v. Estelle*, 616 F.2d 870, 876 (5th Cir.1980) (when determining whether admission of non-*Mirandized* statements is harmless, reviewing court must decide whether, absent that statement, the evidence remains not only sufficient to support the verdict but so overwhelming as to establish the guilt of the accused beyond a reasonable doubt; error harmless because other physical evidence was overwhelming).

**19.** Appellant's brief was filed June 21, 2004, approximately one week before the U.S. Supreme Court issued its opinion in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). Appellant cites the opinion of the Missouri Supreme Court, *State v. Seibert*, 93 S.W.3d 700 (Mo.2002), which was affirmed by the U.S. Supreme Court.

**20.** *See Seibert*, 542 U.S. at 615, 124 S.Ct. 2601.

**21.** *See id.* at 621–22, 124 S.Ct. 2601 (Kennedy, J., concurring). The multi-factor test crafted by the four-justice plurality does not represent the holding in *Seibert*. The holding of *Seibert* is found in Justice Kennedy's concurrence. *See Hernandez*, 2006 WL 2602078,

crime for which he was arrested, without the benefit of *Miranda* warnings, the officers deliberately used a two-step interrogation technique to undermine the protections of *Miranda*.

In *Jones*, a Texas Ranger questioned the appellant, while in custody for one offense, about two extraneous murders.[22] After the appellant orally admitted his involvement in the murders, the officer wrote down "verbatim" what the appellant said, during an interview that lasted approximately an hour-and-a-half, postponing *Miranda* warnings until he asked the appellant to sign the written statement.[23] The court of criminal appeals held that the circumstances reflected "a serious misunderstanding by law enforcement" of the requirements of *Miranda*.[24] The court found that the unwarned oral statement and the written warned statement "were given during a nearly undifferentiated sin-

gle event, taking place in the same room as an uninterrupted and continuous process."[25] The court held that to declare the statement admissible by virtue of the late warnings "would undermine the spirit and intent of *Miranda*."[26]

In *Seibert*, the United States Supreme Court addressed a "question-first" interrogation strategy, by which officers intentionally questioned a person under arrest without giving *Miranda* warnings until the suspect confessed, then gave the warnings and repeated the questioning to get the same incriminating response.[27] Justice Kennedy, concurring with a plurality of four other justices, held that a post-*Miranda* statement given after pre-*Miranda* statements, should be judged under the standard laid out in *Oregon v. Elstad*, 470 U.S. 298, 314, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985),[28] unless the withholding of *Miranda* warnings was a deliberate strategy

at *2, 2006 U.S.App. LEXIS 23258, at *7 n. 1 (citing *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.")); *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir.2006); *United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir.2006); *United States v. Naranjo*, 426 F.3d 221, 231 (3rd Cir.2005). Thus, the holding in *Seibert* is that a trial court must suppress post-warning confessions obtained during a *deliberate* two-step interrogation where the midstream *Miranda* warning—in light of the objective facts and circumstances—did not effectively apprise the suspect of his rights. *Seibert*, 542 U.S. at 621–22, 124 S.Ct. 2601 (Kennedy, J., concurring). Although the *Seibert* plurality would consider all two-stage interrogations eligible for a *Seibert* inquiry, Justice Kennedy's opinion narrowed the *Seibert* exception to those cases involving deliberate use of the two-step procedure to weaken *Miranda's* protections. *See id.; Williams*, 435 F.3d at 1157. Although

the majority in the present case recognizes the Fifth Circuit authority cited above, it nonetheless finds the interpretation rule cited in *Marks* "inapplicable." The majority cites authority from the Tenth Circuit in support of its position. *See United States v. Carrizales–Toledo*, 454 F.3d 1142, 1151 (10th Cir.2006).

22. *Jones*, 119 S.W.3d at 771.

23. *Id.* at 771–72.

24. *Id.* at 774.

25. *Id.* at 775.

26. *Id.*

27. *Seibert*, 542 U.S. at 616–17, 124 S.Ct. 2601.

28. *See Oregon v. Elstad*, 470 U.S. 298, 314, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In *Elstad*, the Supreme Court held that "absent deliberately coercive or improper tactics," "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily

on the part of law enforcement officials to circumvent the protections of *Miranda*.[29] Justice Kennedy narrowed the *Seibert* test to two parts.[30] First, a court must decide whether the officers made a "deliberate" choice to flout *Miranda* in the first round of interrogation.[31] If so, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made."[32] Such "curative measures" include, for example, a sufficient break in time or circumstances between interrogations, or a warning to the suspect that the first statement cannot be used against him.[33]

Appellant argues that "[a]s in *Jones* and *Seibert,* the unwarned and warned portions of the interviews with [him] here were done as part of one continuous process."

The only witness at the hearing on appellant's motion to suppress was Macario Sosa, the Houston police officer who arrested appellant. Officer Sosa testified that pursuant to a Crime Stoppers tip, appellant was identified as a suspect in the robbery that resulted in the murder of Manuel Arriaga–Molina, one of the victims. Two of the surviving victims, Gustavo Lopez Camilo and Alfredo Loredo Balderas, identified appellant as a participant in the crime from a photo array. Officer Sosa obtained an arrest warrant and arrested appellant about 10:30 a.m. The officer told appellant why he was being arrested, and appellant denied knowing anything about the situation. Officer Sosa transported appellant to police headquarters and asked him if he was willing to take a polygraph examination. Officer Sosa did not provide *Miranda* warnings to appellant. Officer Sosa provided the case file to the polygraph examiner, who then prepared the questions. Appellant was taken to a "polygraph room" in the same building (police headquarters) for a polygraph examination. Officer Sosa testified that the polygraph procedure, including preparation of the questions and the examination itself, took three to four hours. After the examination, Officer Sosa was advised that the polygraph results showed "deception" on appellant's answers to some questions. Officer Sosa confronted appellant with the polygraph results. Appellant was then taken before a magistrate at municipal court (at a separate location) around 5:00 p.m., and was advised of his *Miranda* rights. Immediately thereafter, appellant was taken to a "central hold area," at a separate location, where he gave his videotaped statement.

On cross-examination, defendant's counsel asked Officer Sosa if he recalled the questions appellant was asked during the polygraph examination that "supposedly reflected deception." Officer Sosa responded that he did not. Defense counsel questioned Officer Sosa about appellant's reaction when he was told that he "failed" the polygraph examination. Officer Sosa stated that he did not recall.

should suffice to remove the conditions that precluded admission of the earlier statement." *Id.*

**29.** *Seibert,* 542 U.S. at 621–22, 124 S.Ct. 2601 (Kennedy, J., concurring).

**30.** *Id.* at 622, 124 S.Ct. 2601; *see also Courtney,* 463 F.3d at 338–39.

**31.** *Seibert,* 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring).

**32.** *Id.*

**33.** *Id.*

At the suppression hearing, Officer Sosa testified as follows:

Q [by defense counsel]: Now, on the tape we heard some references to yeah, that's what they told me, or, yeah, that's what that guy said, with reference to like the number of shots. Who would "they" have been when he's pointing to the wall there?

A [Officer Sosa]: The polygraph examiner.

Q: So the polygraph examiner gives the person information as they're asking questions about the offense; is that correct?

A: I wasn't present so I can't tell you exactly what happened during the examination.

Q: So you can't say for sure that the polygrapher did not provide him with details of the offense in order to ask him questions?

A: I can't say whether he provided details and *Miranda* warnings, what have you, no, ma'am.

Q: Because you have nothing to do with that?

A: I was not present during that time.

We have reviewed appellant's videotaped statement. The tape shows appellant responding to questions posed by Officers Sosa and Hernandez. During the interrogation, there are two instances in which appellant refers to information

about the circumstances of the crime apparently provided by others.[34] Officer Sosa testified that appellant was referring to statements or questions provided by the polygraph examiner.

The record contains no documentation regarding the polygraph examination. Officer Sosa stated that he did not know whether appellant was given *Miranda* warnings prior to being questioned by the polygraph examiner. He also stated that he did not recall the identity of the polygraph examiner. At the suppression hearing, appellant's counsel argued that "the lack, most importantly, of any reading of rights or *Miranda* warnings during all the questioning that occurred throughout the day by the polygraph examiner" tainted appellant's post-warning statement. The burden at the suppression hearing was on the State to prove by a preponderance of the evidence that appellant's statement was voluntarily given.[35] Here, the record shows that Officer Sosa provided the polygraph examiner with the case file, which clearly enabled the examiner to question appellant about the specifics of the crime for which he had been arrested. By doing so, without ensuring that appellant was provided *Miranda* warnings prior to being questioned, I conclude that the officers deliberately engaged in an unconstitutional two-step interrogation strategy designed to undermine the protections of *Miranda*. Accordingly, I conclude that the admissibility of appellant's statement is governed by *Seibert.*[36]

---

34. At one point, regarding information that three people were shot and one died, appellant stated, "that's what they told me over there." Later, appellant made a similar reference that "he told me only three people got shot." Similarly, at trial, Officer Sosa testified that in appellant's statement, when he stated, "that's what they told me, three shots," and pointed to the wall, appellant was referring to another officer.

35. *Miller,* 196 S.W.3d at 266 (citing *Alvarado,* 912 S.W.2d at 211).

36. *Seibert,* 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring).

In his postwarning statement, appellant refers to circumstances of the crime discussed during his unwarned interview with the polygraph examiner. Thus, appellant's postwarning statement was "related to the substance of [his] prewarning statements" and must be "excluded absent specific, curative steps." [37] With regard to whether a "substantial break in time and circumstances" occurred, sufficient to allow appellant to "distinguish the two contexts and appreciate that the interrogation has taken a new turn," [38] I note that appellant was moved to three different locations throughout the afternoon: the polygraph examination was taken at one location, he was then taken before a magistrate at a different location, and his statement was taken at a third location. However, very little time elapsed between these events. Officer Sosa testified that "[o]nce we found that there was an area of deception on the polygraph, we gathered our things or I collected [the appellant], we gathered our things and he was taken to a magistrate." [39] He also testified that "[a]fter the magistrate's warning was read, we proceeded to the central hold area at 61 Riesner, which is where the statement was taken." [40] Although the changes in location may have "distinguished" the contexts for appellant, there was no substantial break in time and no evidence that appellant was told that his pre-warned statements to the polygraph examiner were

likely inadmissible.[41] I conclude that under the holding in *Seibert,* appellant's postwarning statement is inadmissible.

## Harm Analysis

I next examine whether there is a reasonable likelihood that the admission of appellant's videotaped statement materially affected the jury's deliberations.[42] A reviewing court "should calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence." [43]

Here, the two surviving victims identified appellant from a photo array as one of the two assailants involved in the robbery and murder. In appellant's statement, he gave several versions of events regarding the incident, changing his story as to whether three or four people were involved and who was driving. However, in each version, appellant stated that he was in the back seat of the car, did not get out of the car during the incident, and did not personally shoot anyone. In his statement, appellant states he was in the back seat as a "lookout." He also states in his statement that he knew the other people in the car were going to "do a lick," or commit a robbery.

As the court of criminal appeals noted in *McCarthy,*

> A defendant's statement, especially a statement implicating her in the com-

---

**37.** *Id.* at 621, 124 S.Ct. 2601.

**38.** *Id.* at 622, 124 S.Ct. 2601.

**39.** Appellant was taken before a magistrate around 4:50 p.m.

**40.** Appellant's videotaped statement started at 5:16 p.m.

**41.** *Seibert,* 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring).

**42.** *McCarthy,* 65 S.W.3d at 55 ("If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error is not harmless beyond a reasonable doubt.").

**43.** *Id.*

mission of the charged offense, is unlike any other evidence that can be admitted against the defendant. *See Arizona v. Fulminante,* 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In *Fulminante,* the defendant was convicted through the use of a statement obtained in violation of his Fifth and Fourteenth Amendment rights. *See id.* at 287–88, 111 S.Ct. 1246. The Supreme Court noted that

> [A] defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. The admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.[44]

Here, just as in *McCarthy,* appellant's statement was sufficient to establish his guilt as a party.[45] In closing argument, the prosecutor emphasized appellant's statement:

> [Prosecutor]: The fourth way [of four ways to find appellant guilty of capital murder] is as a party, as a lookout to that capital murder, again, promote, assist in the commission of the offense, he solicits, encouraged, directed or aided. If you believe this defendant's statement, you take everything he says as true, says it here twice on this tape: I

was a lookout. I was sitting in the car, looking around, knowing that these guys were going to get a lick. You're a lookout and you're guilty of capital murder.

. . . .

> I watched that tape and you've got it in evidence and I counted at least seven times where the defendant in that particular tape says he's either a lookout or he's watching out.

. . . .

> But if you believe what he says in that statement, he's guilty of capital murder.

Thus, as in *McCarthy,* the State used appellant's statement as direct evidence of his guilt as a party or co-conspirator.[46] As the *McCarthy* court noted,

> A confession is likely to leave an indelible impact on a jury. "If the jury believes that a defendant has admitted the crime, it will doubtless be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case. Apart, perhaps, from a videotape of the crime, one would have difficulty finding evidence more damaging to a criminal defendant's plea of innocence." [47]

I also note that during its deliberations, the jury requested appellant's videotaped statement, among other items. I find that it is impossible to say there is no reasonable likelihood that the State's use of appellant's statement materially affected the jury's deliberations.[48] I cannot conclude,

---

44. *Id.* at 55–56 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).

45. The jury charge instructed the jury on the law of parties and the law of conspiracy.

46. *See McCarthy,* 65 S.W.3d at 54.

47. *Id.* at 56 (quoting *Fulminante,* 499 U.S. at 313, 111 S.Ct. 1246 (Kennedy, J., concurring)).

48. *See id.*

beyond a reasonable doubt, that the admission of appellant's unconstitutionally obtained statement did not contribute to the jury's verdict of guilty.[49] Accordingly, I would sustain appellant's issue, reverse the judgment of the trial court, and remand for a new trial.

**49.** *See id.*