

## NUMBER 13-03-00388-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

RAUL ADAM MARTINEZ, JR.,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                          Appellee.

### On appeal from the 248th District Court
### of Harris County, Texas.

## MEMORANDUM OPINION ON REMAND

**Before Chief Justice Valdez and Justices Yañez and Benavides**
**Memorandum Opinion on Remand by Chief Justice Valdez**

This case is before us on remand from the Texas Court of Criminal Appeals. *See Martinez v. State*, 272 S.W.3d 615 (Tex. Crim. App. 2008). A jury found appellant, Raul Adam Martinez, Jr., guilty of the offense of capital murder, and the trial court assessed punishment at life imprisonment. *See* TEX. PENAL CODE ANN. §§ 12.31(a)(2), 19.03(a) (Vernon Supp. 2009). By a single issue, Martinez asserts that his videotaped statement should not have been admitted into evidence at trial because *Miranda* warnings were not

given at the beginning of the interrogation process. *See Miranda v. Arizona*, 384 U.S. 436, 445 (1966).

On original submission, this Court, after applying Justice Souter's plurality opinion in *Missouri v. Seibert*, 542 U.S. 600 (2004), concluded that the admission of the videotaped statement was not constitutional error because it was made after a proper and functional *Miranda* warning. *Martinez v. State*, 204 S.W.3d 914, 921 (Tex. App.–Corpus Christi 2006), *rev'd*, 272 S.W.3d 615 (Tex. Crim. App. 2008). One justice dissented, concluding that: (1) Martinez's statement was inadmissible because it was "obtained pursuant to a deliberate two-step interrogation technique used to undermine the effectiveness of *Miranda* warnings"; and (2) the admission of the videotaped statement was harmful. *Id.* at 922 (Yañez, J., dissenting).

The court of criminal appeals granted Martinez's petition for discretionary review and concluded that Martinez's videotaped statement was inadmissible because "officers did not apprise Martinez of his *Miranda* rights when they began his custodial interrogation and failed to apply any curative measures in order to ameliorate the harm caused by the *Miranda* violation." *Martinez*, 272 S.W.3d at 627. Accordingly, the court reversed and remanded, directing us to conduct a harm analysis. *Id.* We reverse and remand for a new trial.

## I. FACTUAL BACKGROUND

In the early morning hours of August 3, 2002, two men, one carrying a rifle and one carrying a pistol, approached Alfredo Balderas Loredo ("Balderas"), Gustavo Camilo, and Manuel Arriaga Molina ("Arriaga") in the back parking lot of a Houston apartment complex. Balderas and Camilo described the gunmen as Hispanic males and identified the man carrying the rifle as short and heavy and the man carrying the pistol as tall and skinny.

At trial, Balderas testified that the gunmen approached him and demanded money. The man with the rifle held it to Balderas's stomach, while the man with the pistol pointed his weapon at Camilo and Arriaga. Balderas also testified that he pushed the rifle away from his stomach and Arriaga moved to "help" him but was shot in the stomach. Balderas stated that the men then shot Camilo in the stomach, "knocked" Balderas to the ground, took his wallet, shot him in the neck, and fled. Arriaga died a few hours after the incident. Ballistics evidence indicated that all shots fired during the incident originated from a handgun.

Neighbors, Elizabeth Mercado and Percy Johnson, testified that they lived across the street from the apartment complex. Johnson stated that on the night of the shootings, he saw a four-door Pontiac Grand Am drive into the apartment's parking lot; Mercado testified that the vehicle was red. Johnson stated that he saw two men exit the vehicle, then saw the vehicle reverse and park on the street in front of the apartment complex. A short time later, Mercado and Johnson heard two gunshots and saw two "Chicano" men, one "fat" and one "skinny," return to the vehicle and enter on the passenger's side; then the vehicle drove away.

No suspects emerged in this case until the department received a Crime Stoppers tip identifying Martinez and James Ruiz as primary suspects. When presented with a photo array, Balderas identified Martinez as the short, heavy man who had pointed a rifle, and Ruiz as the tall, skinny man who had wielded a pistol. Camilo only identified Martinez as a gunman. No guns, stolen wallets, or a red Pontiac were ever located. However, the jury heard evidence that Martinez owned a green Chevrolet Malibu as well as a "shotgun" similar to the rifle used in the robbery. Officer Marcario Sosa testified that Chevrolet Malibus and Pontiac Grand Ams "have similarities" because they are manufactured by General Motors.

3

After Martinez was identified as a suspect, Officer Sosa arrested him and took him to the police station.[1]  Upon arriving at the police station, Officer Sosa and his partner, Officer Toby Hernandez, questioned Martinez about the robbery and murder; however, no *Miranda* warnings were given at the scene of the arrest or at the police station.  Martinez denied knowing anything about the incident.  Shortly thereafter, the officers took Martinez to a police polygraph examiner and a polygraph test was administered.  After the test, Officer Sosa informed Martinez that he had failed the polygraph exam.  Martinez was then taken to municipal court where a magistrate gave him *Miranda* and other statutory warnings.  Next, Martinez was taken to the Houston Police Department's central holding station.  At the holding station, Officer Sosa repeated the *Miranda* warnings and then questioned Martinez; this interrogation was videotaped.

## II. PROCEDURAL BACKGROUND

Before trial, Martinez filed a motion to suppress his videotaped statement.  At the suppression hearing, Martinez claimed that he had not received *Miranda* warnings either when he was arrested or before the polygraph examination.  The trial court concluded that Martinez had voluntarily and knowingly waived his right to remain silent and admitted the videotaped statement.

Upon review, the court of criminal appeals described the contents of the video as follows:

> At the beginning of the video, appellant stated that he had become aware of certain facts about the crime through the polygraph examiner.  Although before the polygraph appellant asserted that he was not aware of the robbery and murder, on the videotape appellant discussed pertinent information regarding the crime.  Appellant further stated that he was not one of the assailants who had robbed and shot the victims, but rather was a "lookout" person.  He maintained that he had remained in the backseat of his Chevy Malibu throughout the incident.  Appellant had initially stated that there were

---

[1] James Ruiz was not arrested because at the time he was identified as a suspect, he was deceased.

only three persons involved, but after Officer Sosa informed him of conflicting information, he then stated that there were four persons involved in the incident. Appellant also asserted that the individual who was actually carrying the rifle resembled appellant and that they could easily have been mistaken for each other.

*Martinez*, 272 S.W.3d at 618. The court of criminal appeals then concluded:

> It is evident that the officers treated the videotaped interrogation as a continuation of the first . . . Officer Sosa referred to the first interrogation and restated what he had told appellant during the first interview. While the questions and answers from the first round of interrogation are not in the record, we can conclude from Officer Sosa's reference to the first interrogation that appellant could reasonably assume that a continuity existed between the two interrogations.
>
> On the video, Officer Sosa began by reading the *Miranda* warnings to appellant. He then asked appellant if he understood his rights, and appellant replied affirmatively. Both officers, however, failed to inform appellant that, based on the lack of *Miranda* warnings, any prior statement made during a previous interrogation, including the polygraph exam, could not be used against him.

*Id.* at 625-26 (footnotes omitted). Accordingly, the court of criminal appeals deemed the videotaped statement inadmissible and reversed and remanded. *Id.* at 627. On remand, we determine whether the admission of Martinez's videotaped statement contributed to the jury's guilty verdict.

## II. HARM ANALYSIS

### A.     Standard of Review

The admission of incriminating statements made during a custodial interrogation where no proper *Miranda* warnings were given constitutes constitutional error. *See* TEX. R. APP. P. 44.2(a); *Akins v. State*, 202 S.W.3d 879, 891-92 (Tex. App.–Fort Worth 2006, pet. ref'd.). Constitutional error requires reversal "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a). In conducting this analysis in the context of a *Miranda* error, we must

5

judge the magnitude of the error in light of the evidence as a whole to determine the degree of prejudice to the defendant resulting from that error. *Jones v. State*, 119 S.W.3d 766, 777 (Tex. Crim. App. 2003); *see Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). In other words, "[w]e must review whether the admission of appellant's statement contributed to the jury's verdict of guilty in this cause, regardless of whether there is evidence independent of the statement that is otherwise sufficient to sustain the jury's verdict of guilt." *McCarthy v. State*, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001).

In determining whether constitutional error in the admission of evidence is harmless, we consider several factors, including: (1) the importance of the evidence to the State's case; (2) whether the evidence was cumulative of other evidence; (3) the presence or absence of other evidence corroborating or contradicting the evidence on material points; (4) the overall strength of the State's case; and (5) any other factor, as revealed by the record, that may shed light on the probable impact of the error on the mind of the average juror. *See Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007). Other cases indicate that we may consider additional factors such as the source and nature of the error, the emphasis placed upon the evidence by the State, the probable collateral implications of the error, the weight a juror may have placed on the evidence, and whether finding the error harmless would encourage the State to repeat the conduct. *See Higginbotham v. State*, 807 S.W.2d 732, 735 (Tex. Crim. App. 1991); *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989). A constitutional error does not contribute to the conviction or punishment if the jury's verdict would have been the same even if the erroneous evidence had not been admitted. *Clay*, 240 S.W.3d at 904.

## B.    Analysis

We first note that the State offered evidence of Martinez's guilt independent of his

videotaped statement by offering the testimony of eyewitnesses who identified Martinez from a photo array. The jury also heard evidence that Martinez's car and shotgun were similar to the ones used in the robbery. While this evidence is compelling and indicates the strength of the State's case, "harmlessness [is] not determined solely on the basis of whether there [is] sufficient evidence, independent of the defendant's inadmissible statement, for a reasonable jury to reach the same conclusion which it . . . reached with the statement." *McCarthy*, 65 S.W.3d at 55 (citing *Satterwhite v. Texas*, 486 U.S. 249 (1988)). "We must review whether the admission of appellant's statement contributed to the jury's verdict in this cause, regardless of whether there is evidence independent of the statement that is otherwise sufficient to sustain the jury's verdict." *Id.*

In his videotaped statement, Martinez gave varying explanations as to the events surrounding the robbery and murder. Martinez first stated that he and two other individuals were involved; however, he later told police that a fourth individual participated. Martinez also changed his story about who was driving. Despite these inconsistencies, in each version of the events, Martinez maintained that he sat in the backseat of the car as a "lookout," did not get out of the car during the incident, and did not personally shoot anyone. He also stated that he knew that the other individuals in the car were going to "do a lick," which Martinez defined as commit a robbery, and that he knew that a weapon would be used in the commission of the robbery.

After the trial court read to the jury a charge instructing it on the law of parties and the law of conspiracy, the State, in closing argument, stated:

> The charge gives you four ways to find this defendant guilty of capital murder. Now, those four ways that are based on the charge and the evidence presented in this case, y'all [sic] can consider as a group. Basically—and y'all [sic] don't have to agree on which way the capital murder was committed. Three of y'all [sic] can think it occurred one way. Six of y'all [sic] can think it occurred another way. Three of y'all [sic] can think it

7

occurred a third way, but as long as twelve of you agree that a capital murder occurred, this defendant is guilty of capital murder.

Let me talk to you about the first way. That the defendant was the shooter, the defendant specifically intended to cause the death of Mr. [Arriaga]. . . .

The second way, based on that jury charge, is he held the shotgun while Ruiz shot Mr. [Arriaga] during the course of committing that aggravated robbery. . . .

The third way is the conspiracy to commit capital murder. Basically that the murder with those loaded weapons should have been anticipated by Martinez as a result of carrying out that conspiracy. That means they sat in the car and said, ["]Let's go get a lick,["] with loaded guns, and you go out there with loaded guns, you can reasonably anticipate that someone's going to die as a result of that. . . .

The fourth way is as a party, as a lookout to that capital murder, again, promote, assist in the commission of the offense, he solicits, encouraged, directed or aided. If you believe this defendant's statement, you take everything he says as true, says it here twice on this tape: ["]I was a lookout. I was sitting in the car, looking around, knowing that these guys were going to get a lick.["] You're a lookout and you're guilty of capital murder.

The State's closing argument emphasized Martinez's erroneously admitted statement by instructing the jury that it could reach a guilty verdict by finding that Martinez participated in the robbery and murder as a gunman, as a co-conspirator, or as a "lookout." No evidence other than Martinez's statement was presented to establish that Martinez was a "lookout."

"A defendant's statement, especially a statement implicating [him] in the commission of the charged offense, is unlike any other evidence that can be admitted against the defendant." *Id.* at 55-56 (citing *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) ("[A] defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past

8

conduct.").

In *McCarthy*, the court of criminal appeals held that the erroneous admission of the defendant's statement into evidence was harmful, even though the State offered ample evidence of the defendant's guilt from sources independent of his statement. *Id.* The court noted that although the defendant's statement did not place the murder weapon in the defendant's hands, it was "powerful enough to establish her guilt of capital murder either as a party or as a conspirator." *Id.* at 56. Although Martinez's statement was not used by the State as extensively as that in *McCarthy*, its use here was just as damaging. Martinez's statement, if believed, established his presence at the location of the robbery and murder, his involvement as a "lookout," and his knowledge of an intent to "do a lick." Thus, as in *McCarthy*, the State used Martinez's statement as direct evidence of his guilt as a party or co-conspirator. *Id.* at 54. As *McCarthy* notes,

> A confession is likely to leave an indelible impact on a jury. "If the jury believes that a defendant has admitted the crime, it will doubtless be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case. Apart, perhaps, from a videotape of the crime, one would have difficulty finding evidence more damaging to a criminal defendant's plea of innocence."

*Id.* at 56 (quoting *Fulminante*, 499 U.S. at 313 (Kennedy, J., concurring)).

Moreover, because we are to consider any other factor, as revealed by the record, that may shed light on the probable impact of the error on the mind of the average juror, we note that, during its deliberations, the jury requested Martinez's videotaped statement, among other items, for review. *See Clay*, 240 S.W.3d at 904.

In light of the foregoing, we cannot conclude, beyond a reasonable doubt, that the jury's verdict would have been the same if Martinez's statement had not been admitted. *See id.*; *McCarthy*, 65 S.W.3d at 56. Because we are unable to conclude that Martinez's statement did not contribute to the jury's verdict of guilt, we hold that its admission was not

harmless.  Accordingly, we sustain Martinez's sole issue on appeal.

### III. CONCLUSION

We reverse the judgment of the trial court and remand for a new trial.  *See* TEX. R.

APP. P. 43.2(d); *McCarthy*, 65 S.W.3d at 56.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed
the 13th day of May, 2010.