IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-1917-06






RAUL ADAM MARTINEZ, JR., Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE THIRTEENTH COURT OF APPEALS


HARRIS COUNTY





 Hervey, J., filed a dissenting opinion in which Keller, P.J., Meyers and 
Keasler JJ., joined. 


DISSENTING OPINION 



 The federal constitutional decision in Miranda v. Arizona (1) establishes the prophylactic rule
that an in-custody suspect must be "warned" that he has certain rights, such as the right to remain
silent, before the police can question the suspect. In this case, appellant basically claims that, even
though he received these warnings before he voluntarily made a custodial videotaped statement to
the police, these warnings nevertheless failed to "adequately and effectively" apprise him of his
rights under Miranda.

 The majority opinion appears to decide that Justice Kennedy's one-judge concurring opinion
in Missouri v. Seibert (2) contains the Court's holding in that case. See Marks v. United States, 430
U.S. 188, 193 (1977) (where "a fragmented Court decides a case and no single rationale explaining
the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position
taken by those Members who concurred in the judgments on the narrowest grounds") (internal quotes
omitted). (3) The majority opinion also appears to decide that appellant wins under the "holding" in
Justice Kennedy's concurring opinion in Seibert, because the incomplete record that appellant has
presented establishes that a "two-step interrogation technique was used [in this case] in a calculated
way to undermine the Miranda warning." See Maj. op. at 10.

 The court of appeals' majority opinion decided that Justice Souter's four-judge plurality
opinion in Seibert (4) contains the Court's holding because, even though Justice Kennedy's one-judge
opinion concurred in the judgment on "narrower" grounds, the "underlying rationales of Justice
Kennedy's concurrence and [Justice Souter's] plurality opinion are so divergent that they render
Marks's narrowest-grounds-interpretation rule inapplicable." See Martinez, 204 S.W.3d 914, 918-21
(Tex.App.-Corpus Christi 2006). (5) The court of appeals' majority opinion, however, decided that
appellant loses under Justice Souter's plurality opinion. See id. The court of appeals' dissenting
opinion would have decided that Justice Kennedy's "narrower" one-judge concurring opinion in
Seibert contains the Court's holding under Marks's narrowest-grounds approach and that appellant
should win under this holding. See Martinez, 204 S.W.3d 924-28 (Yanez, J., dissenting). (6) I would
decide that it is unnecessary to determine whether Justice Souter's or Justice Kennedy's plurality
opinions in Seibert control the disposition of this case because appellant has not carried his burden
to present a sufficient record showing that he wins under either one of these opinions. See Word v.
State, 206 S.W.3d 646, 651-52 (Tex.Cr.App. 2006) (appellate courts should not presume error from
a silent record and it is the appealing party's burden to present a record showing properly preserved,
reversible error); Rowell v. State, 66 S.W.3d 279, 280-81 (Tex.Cr.App. 2001). 

 Appellant was convicted of capital murder (murder committed during a robbery) and
sentenced to life in prison. (7) The evidence from appellant's trial shows that three people were shot
during a robbery committed by appellant and another person, both of whom used firearms. One of
the robbery victims died from his gunshot wounds. The other two independently identified appellant
as one of the robbers from a photospread approximately two months after the incident. (8) They also
identified appellant at trial as one of the robbers. The police questioned appellant on the day of his
arrest, and appellant voluntarily made the videotaped custodial statement at issue in this case in
response to police questioning after receiving and waiving his Miranda rights. This statement was
admitted into evidence at appellant's trial. Appellant claimed in this statement that he was in a
nearby car acting as a lookout while others robbed the victims. (9) The state claimed at appellant's trial
that appellant's statement was unworthy of belief, but that even this self-serving statement was
sufficient to establish appellant's guilt. (10)


 Appellant claimed on direct appeal that the trial court erroneously denied a motion to
suppress this statement. Addressing the merits of this claim under the United States Supreme
Court's fractured decision in Seibert, the court of appeals decided that Seibert did not require
suppression of appellant's statement. We exercised our discretionary authority to review this
decision. (11)

 In Seibert, a police officer consciously decided to interrogate the in-custody defendant
without providing Miranda warnings and obtained a confession. See Seibert, 542 U.S. at 604-06. 
After about a twenty-minute break, this same police officer provided the defendant with Miranda
warnings and obtained basically the same confession after more interrogation during which the
interrogating officer also confronted the defendant with some of her prior unwarned statements. See
id. A Missouri trial court suppressed the initial unwarned confession, but admitted the later warned
one. See id. The Missouri Supreme Court decided, in what appears to be a type of "fruit of the
poisonous tree" analysis, that "[i]n the circumstances here, where the interrogation was nearly
continuous, . . . the second [warned] statement, clearly the product of the invalid first statement,
should have been suppressed." (12) In its fragmented decision, a Supreme Court majority rejected a
"fruits" analysis but ultimately agreed with the Missouri Supreme Court that the second warned
confession should have been suppressed. See Seibert, 542 U.S. at 604-18 (Souter, J., joined by
Stevens, Ginsburg and Breyer, JJ.) and at 618-22 (Kennedy, J., concurring in the judgment).

 Justice Souter's plurality opinion in Seibert decided that this confession should have been
suppressed, because by "any objective measure . . . it is likely that if the interrogators employ the
technique of withholding warnings until after the interrogation succeeds in eliciting a confession,
the warnings will be ineffective in preparing the suspect for successive interrogation, close in time
and similar in content" and would "likely mislead and deprive a defendant of knowledge essential
to his ability to understand the nature of his rights." (13) Justice Souter's plurality opinion also
described the facts in that case, which bear very little resemblance to the facts in the record that
appellant has presented in this case:

 At the opposite extreme are the facts here, which by any objective measure reveal a
police strategy adapted to undermine the Miranda warnings. (Footnote omitted). 
The unwarned interrogation was conducted in the station house, and the questioning
was systematic, exhaustive, and managed with psychological skill. When the police
were finished there was little, if anything, of incriminating potential left unsaid. The
warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the
same place as the unwarned segment. When the same officer who had conducted the
first phase recited the Miranda warnings, he said nothing to counter the probable
misimpression that the advice that anything Seibert said could be used against her
also applied to the details of the inculpatory statement previously elicited. In
particular, the police did not advise her that her prior statement could not be used. 
(Footnote omitted). Nothing was said or done to dispel the oddity of warning about
legal rights to silence and counsel right after the police had led her through a
systematic interrogation, and any uncertainty on her part about a right to stop talking
about matters previously discussed would only have been aggravated by the way
Officer Hanrahan set the scene by saying "we've been talking for a little while about
what happened on Wednesday the twelfth, haven't we?" (Citation to record omitted). 
The impression that the further questioning was a mere continuation of the earlier
questions and responses was fostered by references back to the confession already
given. It would have been reasonable to regard the two sessions as parts of a
continuum, in which it would have been unnatural to refuse to repeat at the second
stage what had been said before. These circumstances must be seen as challenging
the comprehensibility and efficacy of the Miranda warnings to the point that a
reasonable person in the suspect's shoes would not have understood them to convey
a message that she retained a choice about continuing to talk. (Footnote omitted).


See Seibert, 542 U.S. at 616-17.


 Justice Kennedy's concurring opinion asserted that Justice Souter's plurality opinion "cuts
too broadly" by applying "an objective inquiry from the perspective of the suspect" to "both
intentional and unintentional two-stage interrogations." See Seibert, 542 U.S. at 621-22 (Kennedy,
J., concurring in the judgment). Justice Kennedy stated that he "would apply a narrower test
applicable only in the infrequent case, such as we have here, in which the two-step interrogation
technique was used in a calculated way to undermine the Miranda warning." See id. Apparently
agreeing with the rest of Justice Souter's plurality opinion, Justice Kennedy further stated that, where
a "deliberate two-step strategy" is used, the postwarning statements "that are related to the substance
of prewarning statements" must be excluded unless curative measures are taken before the
postwarning statement is made. See id. These curative measures "should be designed to ensure that
a reasonable person in the suspect's situation would understand the import and effect of the Miranda
warning and of the Miranda waiver." See id. "For example, a substantial break in time and
circumstances between the prewarning statement and the Miranda warning may suffice in most
circumstances, as it allows the accused to distinguish the two contexts and appreciate that the
interrogation has taken a new turn." See id. 

 In this case, appellant filed a motion to suppress his statement about a month before his trial
began. His motion to suppress alleged, in relevant part, that:

 The written statements, admissions or confessions, if any were made, do not reflect
that the proper admonitions were given, in violation of Article 38.22, Section 2 of
the Texas Code of Criminal Procedure; the Fifth, Sixth and Fourteenth
Amendments to the United States Constitution; and Article I, Section 10 of the
Texas Constitution.


(Emphasis in original).


 The only witness to testify at the suppression hearing was Officer Macario Sosa. He testified
that he arrested appellant for this offense and took him to a police station, where they arrived at
about 10:30 a.m. Appellant denied any involvement in the offense when Sosa and another officer
asked appellant if he wanted to discuss it. Sosa testified that he had not "read [appellant] his
[Miranda] rights at that time." (14)

 Apparently not satisfied with appellant's answer denying any involvement in the offense,
Sosa then arranged for appellant to take a polygraph examination. These arrangements took about
an hour during which time appellant was not questioned by the police. (15) Although Sosa did not
specifically inform appellant that "he didn't have to take the polygraph or talk to anybody about this
offense," he did ask him if he was willing to do so. (16) An "unknown polygrapher" conducted the
polygraph examination, which lasted about three or four hours until about 4:30 p.m. Sosa was not
present during the polygraph examination. Sosa testified at the suppression hearing that he did not
know whether the polygraph examiner informed appellant of his Miranda rights.

 Q. [DEFENSE]: So the polygraph examiner gives the person information as they're
asking questions about the offense; is that correct?


 A. [SOSA]: I wasn't present so I can't tell you exactly what happened during the
examination.


 Q. So you can't say for sure that the polygrapher did not provide him with details of
the offense in order to ask him questions?


 A. I can't say whether he provided details and Miranda warnings, what have you, no,
ma'am. (17)


 When the polygraph examination was over, Sosa was informed by the polygraph examiner
that appellant had "failed" it. (18) The record is otherwise silent on just exactly what occurred during
the three to four-hour polygraph examination. (19)

 Sosa informed appellant that he had "failed" the polygraph examination (20) and then took
appellant before a magistrate, who informed appellant of his Miranda rights at about 4:55 p.m. Sosa
then took appellant to another police station where Sosa again informed appellant of his Miranda
rights at about 5:16 p.m. This was the first time that Sosa personally informed appellant of his
Miranda rights. Appellant waived these rights and voluntarily provided the statement at issue in this
case while being questioned by Sosa and another officer. The police stopped questioning appellant
at 6:08 p.m. During this interview of appellant, the police did not refer to, or confront appellant
with, any statements (incriminating or otherwise) that appellant may have made during the polygraph
examination and the police did not repeat that appellant had "failed" the polygraph examination. (21)

 Appellant's closing statement at the suppression hearing presented a smorgasbord of reasons
for suppressing appellant's statement. None of these reasons, however, presented a claim that
appellant's statement, "clearly the product of [any] invalid first statement, should have been
suppressed" (22) or that appellant had not been "adequately and effectively" apprised of his Miranda
rights before he made this statement. (23)

 [DEFENSE]: Your Honor, just preliminarily, we note the lack of an expressed waiver
of rights at the beginning of the videotape basically with the detective, knowing these
rights, do you want to talk? There is no express waiver of the rights; however, more
importantly, we ask you to consider the day-long worth of activities that seem to be
quite vague in Detective Sosa's mind, the lack of any record-keeping, the inability
to explain what's been going on, what was talked about all day long, the lack, most
importantly, of any reading of rights or Miranda warnings during all the questioning
that occurred throughout the day by the polygraph examiner and then through these
huge blanks of time up until the trip to the magistrate, which did not occur until
almost 5:00 o'clock.


 We submit those are not sufficient intervening circumstances to remove any taint. 
First of all, the lack of warnings before the day's questioning and then on the tape
itself. We urge you to consider the coercive techniques that are used, the
argumentation of [appellant's] refusal to accept his denials of guilt, the suggestion
made that there is evidence that exists when it doesn't truly exist and so forth. And
we also urge you to consider Detective Sosa's lack of memory concerning the events
surrounding the taking of the statement also raise some question about the credibility
involved with regard to what he says about what was done. We urge you to suppress
the statement. (24)


 In its closing statement at the suppression hearing, the state argued that appellant voluntarily
made the statement after receiving, understanding and waiving his Miranda rights.

 [STATE]: Very brief, Judge. All I would do is reoffer, of course, the videotape that
you heard and take into consideration everything that Officer Sosa said in terms of
[appellant] not being forced, threatened, promised, anything in any way to give the
statement that he did, that his Miranda warnings were given properly, they were read
off the blue card, State's Exhibit No. 2. Specifically after each warning, the
defendant was asked whether or not he understood that right. He did. He did it again
on the videotape. He was-not only purchased food and drink, allowed to go to the
rest room, allowed to make phone calls, bottom line, Judge, is his statement was
voluntarily made. (25)


 The trial court denied appellant's motion to suppress based on findings that appellant "did
freely, voluntarily and knowingly waive his rights to remain silent and give that statement." The trial
court made the following ruling:

 [THE COURT]: I am going to admit the statement. I make a specific finding I have
found Officer Sosa to be a credible witness. The arrest warrant is a good arrest
warrant. It appeared that [appellant] did freely, voluntarily and knowingly waive his
rights to remain silent and give that statement. There was no testimony of any
threats. The behavior of Officer Sosa appears to be exemplary and it is admitted. (26)


 When the state offered appellant's statement into evidence at appellant's trial just two days
after the suppression hearing, appellant reurged his "earlier objection" and for the first time directed
the trial court's attention to "Missouri v. Seibert."

 [STATE]: At this time I'm going to offer 1A into evidence.


 [DEFENSE]: Your Honor, at this time we reurge our earlier objection and just to add
to it, a reference to Missouri v. Seibert, S-E-I-B-E-R-T, U.S. Supreme Court case,
pending, No. 02-1371. (27)


 [THE COURT]: My ruling stands the same. Admitted.


 Appellant's claim for suppressing his statement became even more focused and clear in his
brief on direct appeal. In addition to containing a citation to the Missouri Supreme Court's decision
in Seibert, appellant's brief on direct appeal also presented the argument that the admission into
evidence of his statement was constitutional error, because "the unwarned and the warned
questioning occurred as an uninterrupted and continuous process." Among other things, appellant
argued in his brief on direct appeal:

 What occurred here was that the unwarned interrogation process, including
submitting Appellant for polygraphing, was used tactically to get Appellant to make
admissions before he was aware of his legal rights. That Appellant eventually
received his warnings before the video recorder was turned on was too little too late
after about hours [sic] of custodial interrogation.


 In Miranda, the Supreme Court, having concluded that in-custody interrogation of a suspect
by the police is "inherently compelling," decided that it was constitutionally necessary for the police
to "adequately and effectively apprise[]" the in-custody suspect of certain rights, such as the right
to remain silent, before interrogation can begin in order "to combat these [inherently compelling]
pressures and to permit [the suspect] a full opportunity to exercise the [Fifth Amendment] privilege
against self-incrimination (sic)." See Miranda, 384 U.S. at 445-58, 467 (emphasis supplied). (28) 
Justice Souter's plurality opinion in Seibert decided that the "question-first" interrogation technique
of informing an in-custody suspect of his Miranda rights in the middle of a "coordinated and
continuing interrogation" after the suspect has fully confessed does not "adequately and effectively
apprise[]" this suspect of his rights. See Seibert, 542 U.S. at 611-14. This opinion states:

 When a confession so obtained is offered and challenged, attention must be paid to
the conflicting objects of Miranda and question-first. Miranda addressed
"interrogation practices . . . likely . . . to disable [an individual] from making a free
and rational choice" about speaking, (citation omitted), and held that a suspect must
be "adequately and effectively" advised of the choice the Constitution guarantees,
(citation omitted). The object of question-first is to render Miranda warnings
ineffective by waiting for a particularly opportune time to give them, after the suspect
has already confessed.


 Just as "no talismanic incantation [is] required to satisfy [Miranda's] strictures,"
(citation omitted), it would be absurd to think that mere recitation of the litany
suffices to satisfy Miranda in every conceivable circumstance. "The inquiry is
simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as
required by Miranda.'" (Citations omitted). The threshold issue when interrogators
question first and warn later is thus whether it would be [objectively] reasonable to
find that in these circumstances the warnings could function "effectively" as Miranda
requires. Could the warnings effectively advise the suspect that he had a real choice
about giving an admissible statement at that juncture? Could they reasonably convey
that he could choose to stop talking even if he had talked earlier? For unless the
warnings could place a suspect who has just been interrogated in a position to make
such an informed choice, there is no practical justification for accepting the formal
warnings as compliance with Miranda, or for treating the second stage of
interrogation as distinct from the first, unwarned and inadmissible segment. 
(Footnote omitted).


 There is no doubt about the answer that proponents of question-first give to this
question about the effectiveness of warnings given only after successful
interrogation, and we think their answer is correct. By any objective measure,
applied to the circumstances exemplified here, it is likely that if the interrogators
employ the technique of withholding warnings until after interrogation succeeds in
eliciting a confession, the warnings will be ineffective in preparing the suspect for
successive interrogation, close in time and similar in content. After all, the reason
that question-first is catching on is as obvious as its manifest purpose, which is to get
a confession the suspect would not make if he understood his rights at the outset; the
sensible underlying assumption is that with one confession in hand before the
warnings, the interrogator can count on getting its duplicate, with trifling trouble. 
Upon hearing warnings only in the aftermath of interrogation and just after
making a confession, a suspect would hardly think he had a genuine right to
remain silent, let alone persist in so believing once the police began to lead him
over the same ground again. (Footnote omitted). A more likely reaction on a
suspect's part would be perplexity about the reason for discussing rights at that point,
bewilderment being an unpromising frame of mind for knowledgeable decision. 
What is worse, telling a suspect that "anything you say can and will be used against
you," without expressly excepting the statement just given, could lead to an entirely
reasonable inference that what he has just said will be used, with subsequent silence
being of no avail. Thus, when Miranda warnings are inserted in the midst of
coordinated and continuing interrogation, they are likely to mislead and "depriv[e]
a defendant of knowledge essential to his ability to understand the nature of his rights
and the consequences of abandoning them." (Citation omitted). By the same token,
it would ordinarily be unrealistic to treat two spates of integrated and proximately
conducted questioning as independent interrogations subject to independent
evaluation simply because Miranda warnings formally punctuate them in the middle.


Id. (emphasis supplied).


 Justice Souter's plurality opinion in Seibert, therefore, sets out a rule that first providing
Miranda warnings to an in-custody suspect in the middle of a nearly continuous interrogation after
the suspect has just confessed is the same as providing no Miranda warnings at all. If the police then
obtain another warned confession during this nearly continuous interrogation process in the absence
of any "curative measures," this confession must be suppressed, since this confession will be
considered to have been obtained without the requisite prophylactic Miranda warnings. (29) See
Seibert, 542 U.S. at 611-16. Justice Kennedy's concurring opinion apparently agrees except to
require "that the two-step [or question-first] interrogation technique was used in a calculated way
to undermine the Miranda warning." See Seibert, 542 U.S. at 622 (Kennedy, J., concurring in the
judgment). (30) Both of these opinions, therefore, considered it significant (almost dispositive) that the
unwarned interrogation produced a confession that was repeated almost verbatim a very short time
later (about twenty minutes) during a warned interrogation. The statement in this Court's opinion
that it "is immaterial to our consideration whether incriminating statements emerged from the
unwarned interrogation" (31) ignores the most significant component of Seibert that led the Court to
conclude that the Miranda warnings provided to the defendant, just twenty minutes after she
provided a complete confession during an unwarned interrogation, failed to "adequately and
effectively" inform the defendant that she did not have to provide another confession. See, e.g.,
Seibert, 542 U.S. at 615 (some relevant facts that "bear on whether Miranda warnings delivered
midstream could be effective enough to accomplish their object" are "the completeness and detail
of the questions and answers in the first round of interrogation [and] the overlapping content of the
two statements").

 Assuming that appellant preserved a Seibert claim for appellate review, (32) appellant has not
presented a record showing that he is entitled to relief under Seibert. The record does not show that
the police actually used the "question-first" interrogation technique described in Seibert, and that,
if they did use such a tactic, they did so in a calculated way to undermine the Miranda warning. This
record does not support a finding that appellant had just confessed during a nearly continuous and
uninterrupted interrogation process when Sosa informed appellant of his Miranda rights and
obtained the statement at issue here. (33)

 The incomplete record that appellant has presented does show that, when appellant was first
brought to the police station, the police did not interrogate him for purposes of Miranda (34) and
appellant did not make any unwarned incriminating statements that the police later used during the
warned interview. And, because the record is silent on exactly what occurred during the polygraph
examination, it is difficult, if not impossible, to conclude that something may have transpired during
this polygraph examination to cause the subsequent giving of the Miranda warnings to be
ineffective. (35) Such a conclusion would be based on pure speculation. (36) The record that appellant
has presented does not establish that someone in appellant's position "would hardly think that he had
a genuine right to remain silent" when he voluntarily provided the custodial statement at issue in this
case after being informed of and waiving his Miranda rights. See Word, 206 S.W.3d at (appealing
party has burden to present a record showing properly preserved, reversible error).

 The majority opinion permits appellant to win by presenting an incomplete record showing
no reversible error with gaping holes of silence on critical issues, based on the assertion that this
Court has "long held that the prosecution bears the burden of proving admissibility when a Miranda
violation is found." See Maj. op. at 11 (citing Creager v. State, 952 S.W.2d 852, 860 (Tex.Cr.App.
1997) and Alvarado v. State, 912 S.W.2d 199, 211 (Tex.Cr.App. 1995)). The cases cited in the
majority opinion do not support a holding that the appealing party can present an incomplete and
silent record showing no reversible error and win. (37)

 The majority opinion's citation to Creager cites to a concurring opinion in Creager which
sets out the unremarkable proposition that "[w]hen the State bears the burden of proof on a motion
in which the defendant seeks to suppress a statement, which he claims was obtained in violation of
Miranda, the State need prove waiver only by a preponderance of the evidence." See Creager, 952
S.W.2d at 860 n.2 (Meyers, J., concurring). Alvarado did not involve a claimed Miranda violation,
and the defendant in Alvarado, rather than relying on an incomplete and silent record, actually
testified and presented other evidence at a suppression hearing that raised the issue of the
voluntariness of his confession before the state was put to its burden to prove voluntariness. See
Alvarado, 912 S.W.2d at 210-11; (38) see also Kelly v. State, 204 S.W.3d at 819 n.22 (state does not
assume burden to prove voluntariness of a defendant's confession unless the defendant carries initial
burden to raise an issue of involuntariness of the confession).

 A defendant has always been required to make some initial showing on the record in the trial
court that raises a legitimate issue of whether he is entitled to relief under the specific claim that he
presents (usually by making an evidentiary showing that would support the claim). See Herrera v.
State, 241 S.W.3d 520, 526-27 (Tex.Cr.App. 2007) (mere filing of motion to suppress does not
thrust burden on the state to show compliance with Miranda unless and until defendant proves that
statements he wishes to exclude were result of custodial interrogation) and at 533-34 (Cochran, J.,
concurring) ("The right to Miranda warnings applies once the defendant establishes that the setting
is one of custodial interrogation. [Footnote omitted]. Only then does the State have a 'heavy burden'
to establish that Miranda warnings were given and that the defendant voluntarily waived those rights
and voluntarily responded to custodial questioning."). (39) Only then does the burden shift to the state
to defeat this specific claim with its failure to do so being grounds for a successful appeal by the
other party. See id. The Court's decision is based on the state's failure to prove something that it
never had the burden to prove, because appellant never "raised" the issue. (40) 

 In this case, the state carried its "heavy burden" in the trial court to establish that Miranda
warnings were given and that appellant voluntarily waived his Miranda rights and voluntarily
responded to custodial questioning producing the videotaped statement at issue in this case. If
appellant really meant to put the trial court and the other party on notice that it needed to prove that
these warnings really did not "adequately and effectively" apprise him of these rights, then he should
have said so instead of remaining silent. In other words, he should have "raised" this issue. 

 I respectfully dissent.


 Hervey, J.


Filed: December 17, 2008

Publish
1. 384 U.S. 436, 478-79 (1966).
2. 542 U.S. 600, 618-22 (2004) (Kennedy, J., concurring in the judgment).
3. See Maj. op. at 8 (finding Justice Kennedy's reasoning persuasive).
4. See Seibert, 542 U.S. at 604-18 (Souter, J., joined by Stevens, Ginsburg, and Breyer, JJ.).
5. If this were so, Justice Souter's plurality opinion in Seibert could not contain a majority
holding and would have little, if any, binding effect in this case. Under these circumstances, the
Supreme Court's majority opinion in Oregon v. Elstad would arguably control the disposition of this
case, and appellant would lose. See Oregon v. Elstad, 470 U.S. 298, 318 (1985) ("a suspect who has
once responded to unwarned yet noncoercive questioning is not thereby disabled from waiving his
rights and confessing after he has been given the requisite Miranda warnings"); see also Seibert, 542
U.S. at 612 n.4 (suggesting that the defendant would have lost under Elstad); but see Seibert, 542
U.S. at 622-29 (O'Connor, J., dissenting, joined by Rehnquist, C.J., and Scalia and Thomas, JJ.)
(suggesting that defendant might have won under Elstad).
6. The court of appeals' dissenting opinion, therefore, would have decided that appellant wins
under a "narrower" holding than the one that the court of appeals' majority opinion decided that
appellant loses under.
7. The state did not seek the death penalty.
8. During closing jury arguments, the state claimed that it was significant that both victims
independently identified appellant as one of the robbers (apparently comparing the chances of this
to winning the lottery):


 [STATE]: Mr. Camilo couldn't look at him or point at him. They scared the hell out
of him. But what's their motive? And, furthermore, let me ask you this, gee, because
I want in on this. What are the odds that those two little Mexican men are going to
pick the same defendant, the same man that had the shotgun pointed at them that
night who also owns a shotgun, who also has a skinny friend that meets the
description that was given by the name of James Ruiz and that also the defendant
himself puts himself there? What are the odds? Boy, if that was a lottery ticket, we
would all be rich and never have to work again. Wouldn't that be nice?
9. Appellant's statement was the only evidence presented at appellant's trial that did not place
appellant at the scene of the robbery where the victims were shot. All of the other evidence shows
that appellant was at the scene of the robbery. Though the greater weight of the evidence presented
at appellant's trial establishes that appellant was one of two armed robbers at the scene of the
robbery, this evidence also raised a legitimate question of whether appellant actually fired his
weapon. Our review of the trial record indicates that whether appellant actually fired his weapon,
and not whether he was at the scene of the robbery, was probably the most legitimately disputed
factual issue at appellant's trial.
10. For example, the state argued during closing jury arguments at appellant's trial:


 [STATE]: If you believe this defendant's statement, you take everything he says as
true, says it here twice on this tape: I was a lookout. I was sitting in the car, looking
around, knowing these guys were going to get a lick. You're a lookout and you're
guilty of capital murder.

* * *

 Now [appellant's lawyer], would have you and she went on about, you know, this
confession and all this suggestiveness and et cetera, et cetera, et cetera, as though the
officers put these words in her client's mouth. Well, you know what? I watched that
tape and you've got it in evidence and I counted at least seven times where the
defendant in that particular tape says he's either a lookout or he's watching out. I
don't believe that. I think that statement is totally self-serving and I think you
probably all do, too. You're intelligent.

* * *

 Well, you know what? If you want to believe that statement, you go right ahead, but
even-if you believe that statement, I don't, but if you do and it's up to you, you are
the judges of the evidence before you. You believe it, fine. But if you believe what
he says in that statement, he's guilty of capital murder.
11. The ground upon which we granted review states:


 Whether the Court of Appeals misapplied the standards of Seibert in determining that
a proper and functional Miranda warning was given Appellant here and finding
Appellant's custodial statement admissible.
12. See State v. Seibert, 93 S.W.3d 700, 701 (Mo. 2002), aff'd, 542 U.S. at 617; but see Seibert,
542 U.S. at 612 n.4.
13. Justice Souter's plurality opinion sets out "a series of relevant facts that bear on whether
Miranda warnings delivered midstream could be effective enough to accomplish their object: the
completeness and detail of the questions and answers in the first round of interrogation, the
overlapping content of the two statements, the timing and setting of the first and second, the
continuity of police personnel, and the degree to which the interrogator's questions treated the
second round as continuous with the first." See Seibert, 542 U.S. at 615; see also Martinez, 204
S.W.3d at 917, 921 (applying these factors to uphold admissibility of appellant's voluntary custodial
statement).
14. The majority opinion asserts that the police "questioned appellant about the crime at the
police station without giving the required [Miranda] warnings." See Maj. op. at 10. The record that
appellant has presented reflects that, when Sosa initially brought appellant to the police station,
appellant denied any involvement in the offense when Sosa and another officer asked appellant if
he wanted to discuss it. The police asking appellant if he wanted to discuss it is not "interrogation"
for Miranda purposes. See Rhode Island v. Innis, 446 U.S. 291, 301 (1980) ("interrogation" is any
words or actions on the part of the police that the police should know are reasonably likely to elicit
an incriminating response); Moran v. State, 213 S.W.3d 917, 922-23 (Tex.Cr.App.), cert. denied,
128 S.Ct. 235 (2007) (police officer's comment to in-custody defendant that the police had spoken
to other witnesses just after defendant had invoked his right to counsel when police asked defendant
if he wanted to discuss the offense was not "interrogation" thus not requiring exclusion of
defendant's subsequent incriminating statement). The police were, therefore, not required to provide
Miranda warnings before asking appellant if he wanted to discuss it. Even if it could be said that
the police "questioned appellant about the crime" for Miranda purposes when they initially brought
him to the police station, appellant's denial of any involvement in the offense after the police asked
him if he wanted to discuss it was nothing like the twenty or thirty minute, unwarned interrogation
in Seibert that produced the defendant's incriminating statement, which she repeated about twenty
minutes later during the same interrogation. See Seibert, 542 U.S. at 604-05. 
15. Sosa testified that the polygrapher reviews the entire case file in order to decide which
questions to ask during the polygraph examination.
16. The record appears to reflect that appellant agreed to take the polygraph examination after
Sosa asked him if he was willing to do so.


 Q. [DEFENSE]: Like I said, up until that time, you had never given him any
indication that he didn't have to take the polygraph or talk to anybody about this
offense?


 A. [SOSA]: I had basically asked him if he was willing to take a polygraph in regards
to this incident.
17. The court of appeals (as does this Court) apparently considered this testimony to mean that
appellant was not Mirandized before the polygraph examination. See Martinez, 204 S.W.3d at 921
("The instant case presents a Seibert problem because [appellant] made pre-Miranda statements to
police officers and a polygraph examiner, was then given separate Miranda warnings by a magistrate
and the interrogating officers, and finally appeared in a videotaped interrogation that was admitted
into evidence at trial."). This testimony, however, does not establish that appellant was not
Mirandized before the polygraph examination. The record is actually silent on this critical issue
under Seibert. This issue is critical under Seibert, because, if appellant was Mirandized before the
polygraph examination, then he loses under any reading of Seibert.
18. The record is silent on which portions of the three to four-hour polygraph examination that
appellant "failed." For all we know, appellant could have "failed" portions of the polygraph that
were unrelated to this offense (e.g., appellant could have given a false name resulting in him
"failing" the polygraph). Sosa also testified that it would be more accurate to say that "Deception
was indicated" on certain questions, but that he did not know "the precise questions that were asked
that supposedly reflected deception."


 Q. [DEFENSE]: I believe I said earlier that you told [appellant] he failed. In fact,
that's not what a polygraph examiner would say to you; isn't that true? Someone
doesn't fail or pass a polygraph, do they?


 A. [SOSA]: No, that's not a correct term.


 Q. So it would be more correct to say the polygraph expert or examiner would say to
you: Deception was indicated on this question or that question?


 A. They would have given a percentage or degree of deception, yes, ma'am, per
question.


 Q. But, again, without those records, you don't recall the precise questions that were
asked that supposedly reflected deception?


 A. No, ma'am. 
19. See Martinez, 204 S.W.3d at 916 (noting that a "record was not created of the questions,
statements, or results of the polygraph examination"); compare Seibert, 542 U.S. at 613 ("The
unwarned interrogation was conducted in the station house, and the questioning was systematic,
exhaustive, and managed with psychological skill. When the police were finished there was little,
if anything, of incriminating potential left unsaid.").
20. Arguably, this is the only evidence that might raise a viable issue under Seibert, since it is
possible that appellant "would hardly think he had a genuine right to remain silent" after being told
that he had "failed" a polygraph examination. One could speculate on this silent record that
appellant, having initially denied any involvement in the offense when first brought to the police
station, continued to deny any involvement in the offense during the polygraph examination and that,
when confronted by the police with having "failed" the polygraph, he hardly thought he had a
genuine right to remain silent (in part because he could have thought that the "failed" polygraph
could be used against him later at trial) and, thus, after receiving his Miranda warnings twice, gave
the somewhat incriminating statement that minimized his involvement in the offense but still placed
him at the scene (the statement that the state argued at trial still established his guilt). This is another
reason why it might be critical for the record to reflect whether or not appellant received Miranda
warnings before the polygraph examination and what actually occurred during the polygraph
examination.
21. Compare Seibert, 542 U.S. at 616 ("When the same officer who had conducted the first phase
recited the Miranda warnings, he said nothing to counter the probable misimpression that the advice
that anything Seibert said could be used against her also applied to the details of the inculpatory
statement previously elicited. In particular, the police did not advise that her prior statement could
not be used. [Footnote omitted]. Nothing was said or done to dispel the oddity of warning about
legal rights to silence and counsel right after the police had led her through a systematic
interrogation, and any uncertainty on her part about a right to stop talking about matters
previously discussed would only have been aggravated by the way Officer Hanrahan set the
scene by saying 'we've been talking for a little while about what happened on Wednesday the
twelfth, haven't we ?' [Citation omitted ]. The impression that the further questioning was a
mere continuation of the earlier questions and responses was fostered by references back to
the confession already given.") (emphasis supplied). 
22. See Seibert, 93 S.W.3d at 701.
23. See Seibert, 542 U.S. at 611-13.
24. It is also noteworthy that appellant raised no claim or issue during the suppression hearing
that Sosa informing him that he had "failed" the polygraph examination caused the subsequent
giving of the Miranda warnings to him to be ineffective such that he "hardly [thought] he had a
genuine right to remain silent."
25. Appellant made no claim that this failed to address whether the Miranda warnings that he
received before making the statement "adequately and effectively" apprised him of these rights.
26. Appellant made no claim that this ruling failed to address any claim that the Miranda
warnings that appellant received before making the statement did not "adequately and effectively"
apprise him of these rights.
27. It is, therefore, clear that appellant could have alerted the trial court to the Missouri Supreme
Court's decision in Seibert during the suppression hearing just two days before. Appellant's trial
took place between May 19, 2003, and May 23, 2003, with the motion to suppress hearing also
occurring on May 19, 2003. The Missouri Supreme Court had handed down its decision in Seibert
about six months before this on December 10, 2002. See State v. Seibert, 93 S.W.3d at 700. On
May 19, 2003, the Supreme Court exercised its writ of certiorari jurisdiction to review the Missouri
Supreme Court's decision. See Missouri v. Seibert, 538 U.S. 1031 (2003). The Supreme Court
handed down its decision in Seibert on June 28, 2004, about one week after appellant filed his brief
on direct appeal in the court of appeals. See Seibert, 542 U.S. at 600; Martinez, 204 S.W.3d at 924
n.19 (Yanez, J., dissenting). Appellant's brief on direct appeal also cited to the Missouri Supreme
Court's decision in Seibert.
28. There is no Fifth Amendment right "against self-incrimination." The Fifth Amendment right
at issue in Miranda and cases like this is a person's right not "to be compelled in any criminal case
to be a witness against himself" (emphasis supplied). U.S. Const. amend. V. Requiring an in-custody suspect to be informed of his Miranda rights before the police can question him apparently
is intended to safeguard this right. See Miranda, 384 U.S. at 467, 478-79.
29. See Seibert, 542 U.S. at 608 (Miranda conditioned the admissibility at trial of any custodial
confession on warning a suspect of his rights); Miranda, 384 U.S. at 476 (giving of warnings is
prerequisite to admissibility of custodial confession). 
30. The court of appeals' majority opinion in this case, therefore, may have erroneously decided
that "the underlying rationales of Justice Kennedy's concurrence and the plurality opinion [of Justice
Souter] are so divergent that they render Marks's narrowest-grounds-interpretation rule
inapplicable." See Martinez, 204 S.W.2d at 920. It would appear that Justice Kennedy's concurring
opinion might contain the holding in Seibert under Marks's narrower-grounds approach. See also
Martinez, 204 S.W.3d at 920 n.5 (noting that the Fifth Circuit has decided in two recent unpublished
decisions that Justice Kennedy's concurrence sets out the holding in Seibert). The defendant in
Seibert won under Justice Souter's and Justice Kennedy's plurality opinions apparently because
these opinions agreed that the question-first interrogation technique in Seibert was used in a
calculated way to undermine and did undermine the Miranda warning. See Seibert, 542 U.S. at 616
n. 6 (Souter, J.) and at 620 (Kennedy, J.). 
31. See Maj. op. at 14.
32. Arguably, the record from the suppression hearing reflects that neither the trial court, based
on its ruling at the suppression hearing, nor the state, based on its closing statements at the
suppression hearing, understood appellant to be making a claim based on the principles discussed
in either the United States Supreme Court's or the Missouri Supreme Court's decisions in Seibert
(which could explain the lack of a complete record on what exactly occurred during the polygraph
examination, particularly a critical issue under Seibert of whether appellant actually received
Miranda warnings prior to the polygraph examination). See Buchanan v. State, 207 S.W.3d 772,
775 (Tex.Cr.App. 2006) ("When the objection is not specific, and the legal basis is not obvious, it
does not serve the purpose of the contemporaneous-objection rule for an appellate court to reach the
merits of a forfeitable issue that is essentially raised for the first time on appeal.") (emphasis in
original).
33. Compare Jones v. State, 119 S.W.3d 766, 775 (Tex.Cr.App. 2003) (defendant's warned
statement inadmissible because "the unwarned and warned statements in this case were given during
a nearly undifferentiated single event, taking place in the same room as an uninterrupted and
continuous process").
34. And even if it could be said that the single question by the police to appellant asking him if
he wanted to discuss it was interrogation for Miranda purposes, it is clear that this does not resemble
the unwarned interrogation in Seibert that produced a confession.
35. Appellant presented no evidence at the suppression hearing (such as, for example, he was not
informed of his Miranda rights before the polygraph examination or that he fully confessed during
this examination) that would even raise an issue of whether something may have transpired at the
polygraph examination or thereafter that might have caused the subsequent giving of the Miranda
warnings to be ineffective. Compare Seibert, 542 U.S. at 605-06 (interrogating officer testified at
suppression hearing that he "made a 'conscious decision' to withhold Miranda warnings, thus
resorting to an interrogation technique he had been taught; question first, then give the warnings, and
then repeat the question 'until I get the answer that she's already provided once'") and at 616 n.6
(noting that the "intent of the [interrogating] officer will rarely be as candidly admitted as it was
here"). Under these circumstances, the state never assumed any burden to prove that the polygraph
examination (or any interrogation technique that the police could have been using) caused the
subsequent giving of the Miranda warnings to be ineffective. See State v. Kelly, 204 S.W.3d 808,
819 n.22 (Tex.Cr.App. 2006) (state does not assume burden to prove voluntariness of a defendant's
confession unless the defendant carries initial burden to present evidence to support finding of
involuntariness) (citing State v. Terrazas, 4 S.W.3d 720, 727 (Tex.Cr.App. 2006).
36. It is significant that the videotaped interview clearly reflects that the police did not refer to,
or confront appellant with, any statements (incriminating or otherwise) that appellant may have made
during the polygraph examination. See Seibert, 542 U.S. at 604 (interrogating officer follows
unwarned confession with Miranda warnings "and then leads the suspect to cover the same ground
a second time") and at 605 (during warned interrogation, interrogating officer confronts suspect with
her unwarned statements); Martinez, 204 S.W.3d at 921 (noting that appellant "was repeating the
polygrapher's general statements regarding the crime [that three people were shot], not his own
unwarned statements").
37. Our case law is actually to the contrary. See Word, 206 S.W.3d at 651-52.
38. Rather than relying on a silent record, the defendant in Alvarado actually presented evidence
that, if believed by the factfinder, would have supported a finding that the defendant's confession
was involuntary placing the burden on the state to prove voluntariness. See Alvarado, 912 S.W.2d
at 210-11. 
39. See also Kelly, 204 S.W.3d at 819 n.22 (defendant had initial burden to produce evidence to
support finding that she did not consent to blood draw); Ford v. State, 158 S.W.3d 488, 492
(Tex.Cr.App. 2005) (defendant, claiming Fourth Amendment violation, bears initial burden of
producing evidence to support finding of improper police conduct such as proving that a search
occurred without a warrant shifting the burden to the state to establish the validity of the search);
Terrazas, 4 S.W.3d at 727 (state never assumed burden to prove voluntariness of defendant's
confession because defendant did not carry her initial burden of raising an issue of voluntariness). 
40. For example, appellant's suppression motion did not raise an issue of the effectiveness of the
Miranda warnings that appellant received. Appellant's suppression motion alleged that "proper
admonitions" were not given. This is quite different from alleging that "proper admonitions" were
given but that these "proper admonitions" did not "adequately and effectively" apprise appellant of
his rights under Miranda. The allegation in appellant's suppression motion and the arguments he
made at the suppression hearing certainly did not put any burden on the State to prove that these
"proper admonitions" were ineffective. The state responded to the only claim presented in
appellant's suppression motion when it proved at the suppression hearing that "proper admonitions"
were, in fact, given.

 Arguably, appellant's citation to "Seibert" during the middle of trial two days after the
suppression hearing raised the issue of the effectiveness of the warnings. I would, however, decide
that this, coming as it did just two days after the suppression hearing in the middle of trial without
any further explanation of why "Seibert"would require a different result, still did not raise any issue
as to the effectiveness of the warnings under Seibert.