

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1917-06

### RAUL ADAM MARTINEZ, JR., Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE THIRTEENTH COURT OF APPEALS
### HARRIS COUNTY

JOHNSON, J., delivered the opinion of the Court, in which PRICE, WOMACK, HOLCOMB, and COCHRAN, JJ., joined. PRICE, J., filed a concurring opinion. HERVEY, J., filed a dissenting opinion in which KELLER, P.J., and MEYERS and KEASLER, JJ., joined.

## O P I N I O N

Raul A. Martinez, Jr., appeals his conviction for capital murder.[1] Because the state chose not

to seek the death penalty, the jury's finding of guilt resulted in a sentence of life in prison. The

Thirteenth Court of Appeals upheld his conviction.[2] *Martinez v. State*, 204 S.W.3d 914 (Tex.

---

[1] TEX. PENAL CODE § 19.03(a)(2).

[2] The First Court of Appeals initially received appellant's appeal, but transferred the case to the Thirteenth Court of Appeals.

App.—Corpus Christi 2006). This Court granted appellant's petition for discretionary review: "Whether the court of appeals misapplied the standards of *Seibert* in determining that a proper and functional *Miranda* warning was given appellant here and finding appellant's custodial statement admissible." We reverse.

FACTS

In the early morning of August 2, 2003, Alfredo Balderas Loredo, Gustavo Camilo, and Manuel Arriaga Molina were socializing in the rear of an apartment complex in Houston when two men approached them with a rifle and a pistol. Two of the victims described the man carrying the rifle as a short, heavy, Hispanic male and the man carrying a pistol as a tall, skinny, Hispanic male. Mr. Balderas testified that the shorter man pressed the rifle into his abdomen and demanded money. Simultaneously, the taller man pointed the pistol at the other two victims and demanded money. Mr. Arriaga gave his wallet to the taller man, who responded by shooting Mr. Arriaga in the groin. Mr. Camilo also gave his wallet to the taller man, who responded by shooting Camilo in the stomach. The men pushed Mr. Balderas to the ground, took his wallet, shot him in the neck, and fled. Still alert, Mr. Balderas used his cell phone to call his brother-in-law, and his brother-in-law called the police. The three victims were taken to the hospital. Mr. Balderas was treated for his injuries and released that night. Mr. Camilo was hospitalized for a longer period of time and underwent multiple surgeries. Mr. Arriaga died a few hours after the incident.

Detectives Macario Sosa and Toby Hernandez of the Houston Police Department's homicide division investigated the case. There were no suspects until the officers were informed of a Crime Stoppers tip identifying appellant and James Ruiz as the primary suspects. Appellant matched the description of the short, heavy, Hispanic male, and Ruiz matched the description of the tall, skinny,

Hispanic male. Mr. Balderas identified both appellant and Ruiz in a photo array. Mr. Camilo was able to identify only appellant. Officer Sosa secured a "pocket warrant"[3] for appellant's arrest.[4]

On November 18, 2003, Officer Sosa arrested appellant in a convenience-store parking lot. Appellant was driving a late-model green Chevy Malibu.[5] At the time of his arrest, police did not give appellant *Miranda* warnings. At police headquarters, Officers Sosa and Hernandez questioned appellant about the robbery and murder. Appellant, however, denied knowing anything about the incident.

Shortly thereafter, Officers Sosa and Hernandez took appellant to a police polygrapher, who used the case file to develop the questions to be asked and then administered a polygraph test to appellant. This process took three to four hours to complete. The record does not reflect the name of the officer who administered the test, and when asked, Officer Sosa could not identify the officer.[6] Likewise, the questions that were asked during the polygraph examination are not in the record.

After the test, Officers Sosa and Hernandez again took custody of appellant, and Officer Sosa informed appellant that he had failed the polygraph exam.[7] Officer Sosa conceded that it is not customary for a suspect to be informed that he "failed" a test; suspects are usually informed that "deception was indicated on some of the test questions." The record is silent as to which questions

---

[3] Officer Sosa testified that a "pocket warrant" is different from a regular arrest warrant in that it expires after 30 days, while a regular warrant expires when the suspect is arrested or the warrant is recalled.

[4] Officer Sosa did not obtain a pocket warrant for James Ruiz's arrest because, at the time of the identification, Ruiz was deceased.

[5] Appellant conceded that his Malibu had been used in the robbery.

[6] Officer Sosa could not recall the polygrapher's name, but stated that it was a male officer.

[7] Officer Sosa testified that he did not know this to be factually true, but that it had been communicated to him by the polygrapher.

the polygrapher determined that appellant had answered deceptively. Officers then took appellant to municipal court, where a magistrate gave appellant *Miranda* and other statutory warnings for the first time.

Upon appellant's prompt return to the central holding station, Officers Sosa and Hernandez again questioned appellant about the robbery and murder. Officer Sosa repeated the *Miranda* warnings, and appellant gave a videotaped statement regarding the incident.[8] At the beginning of the video, appellant stated that he had become aware of certain facts about the crime through the polygraph examiner. Although before the polygraph appellant asserted that he was not aware of the robbery and murder, on the videotape appellant discussed pertinent information regarding the crime. Appellant further stated that he was not one of the assailants who had robbed and shot the victims, but rather was a "lookout" person. He maintained that he had remained in the backseat of his Chevy Malibu throughout the incident. Appellant had initially stated that there were only three persons involved, but after Officer Sosa informed him of conflicting information, he then stated that there were four persons involved in the incident. Appellant also asserted that the individual who was actually carrying the rifle resembled appellant and that they could easily have been mistaken for each other.

The state indicted appellant for capital murder. Before trial, appellant filed a motion to suppress his statement and requested a hearing. At the hearing on that motion, appellant sought to suppress the videotaped statement because he had not received *Miranda* warnings when he was arrested or before the polygraph examination. Officer Sosa was the state's sole witness at the

---

[8] The videotape was marked as state's exhibit 1. Portions of the interview are missing because the videotape was stopped at various points, and some portions were redacted from the record.

hearing. The trial court found Officer Sosa to be a credible witness, concluded that appellant had voluntarily and knowingly waived his right to remain silent, and admitted the videotaped statement.

On appeal, appellant's sole issue was that the "failure to *Mirandize* appellant before the initial interrogation and the polygraph examination led to constitutional error in the admission of his videotaped statement at trial." *Martinez,* 204 S.W.3d at 914. The court of appeals affirmed appellant's conviction, finding that appellant did not satisfy the five factors set out in *Missouri v. Seibert,* 542 U.S. 600 (2004). It further stated that the admission of the videotaped statement did not constitute constitutional error because it was made after a proper and functional *Miranda* warning. *Id.* at 922.

In his petition to this Court, appellant's sole claim is that the court of appeals misapplied the standards of *Seibert* when it considered whether a proper and functional *Miranda* warning was given.

## *SEIBERT*

Patricia Seibert was charged with murder. After her arrest, she gave a confession about the murder without being given *Miranda* warnings.[9] *Seibert,* 542 U.S. at 600.[10] The detective returned 20 minutes later, gave *Miranda* warnings, and obtained a signed waiver and a second confession. Before trial, Seibert sought to exclude both the unwarned and warned statements. The Missouri trial

---

[9] "A officer from [the Rolla] police department testified that the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession was promoted not only by his own department, but by a national police training organization and other departments in which he had worked." *Seibert* at 609.

[10] In *Miranda v. Arizona*, the United States Supreme Court addressed "interrogation practices . . . likely . . . to disable [an individual] from making a free and rational choice" about speaking. *Miranda v. Arizona,* 384 U.S. 436, 445 (1966). The Court unequivocally ruled that an accused, held in custody, must be given the adequate and effective warnings "prior to questioning," not merely before signing a written statement after all the custodial interrogation is complete. *Id.* at 445. The failure to give timely warnings generally results in the state being required to forfeit the use of any statement obtained during that interrogation during its case-in-chief. *Id.* When a defendant alleges that the *Miranda* protections were thwarted, the burden of showing admissibility rests on the prosecution. *Seibert,* 542 U.S. at 609 (quoting *Brown v. Illinois*, 422 U.S. 590, 604 (1975)).

court excluded only the unwarned statement, and the defendant was convicted of second-degree murder. The Missouri Supreme Court, however, reversed the defendant's conviction, stating that the interrogation was continuous and that the second statement was the product of the invalid first statement. The United States Supreme Court granted *certiorari*. A four-justice plurality also ruled that Seibert's warned statements were inadmissible. *Seibert,* 542 U.S. at 616. The Court stated that

> when a confession so obtained is offered and challenged, attention must be paid to the conflicting objects of *Miranda* and the question-first strategy. *Miranda* addressed "interrogation practices . . . likely. . .to disable [an individual] from making a free and rational choice" about speaking, 384 U.S. at 464-465, and held that a suspect must be "adequately and effectively" advised of the choice the Constitution guarantees. *Id.* at 467. Question-first's object, however, is to render *Miranda* warnings ineffective by waiting to give them until after the suspect has already confessed . . .. By any objective measure, it is likely that warnings withheld until after interrogation and confession will be ineffective in preparing a suspect for successive interrogation, close in time and similar in content. The manifest purpose of question-first is to get a confession the suspect would not make if he understood his rights at the outset. When the warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran v. Burbine*, 475 U.S. 412, 424 (1986).

*Id.* at 601. The plurality further emphasized that

> the threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

*Id.* at 611-12.

The plurality crafted a multi-factor test for determining "whether *Miranda* warnings delivered

midstream" could be effective.

> The contrast between *Elstad* and this case reveals a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615-16.

Although agreeing "with much in the careful and convincing opinion for the plurality," Justice Kennedy's concurring opinion took a narrower view–*Oregon v. Elstad*, 470 U.S. 298 (1985), should be followed unless there is proof that the interrogating officer knowingly and willing utilized the two-stage technique, thus undermining *Miranda* warnings. Justice Kennedy's focus was on "whether admission of the evidence under the circumstances would frustrate *Miranda*'s central concerns and objectives." *Seibert* at 619 (Kennedy, J., concurring). He stated that

> [t]he plurality concludes that whenever a two-stage interview occurs, admissibility of the postwarning statement should depend on "whether [the] *Miranda* warnings delivered midstream could have been effective enough to accomplish their object" given the specific facts of the case. This test envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations . . .. In my view, [the plurality's] test cuts too broadly . . .. I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning . . .. *Miranda's* clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity. *Cf. Berkemer v. McCarty*, 468 U.S. 420, 430 (1984).

> The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning

statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. *Cf. Westover v. United States*, decided with *Miranda v. Arizona*, 384 U.S. 436 . . . (1966). Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient. No curative steps were taken in this case, however, so the postwarning statements are inadmissible and the conviction cannot stand.

*Seibert* at 621-22 (Kennedy, J., concurring). We find Justice Kennedy's reasoning persuasive.

*ELSTAD*

Before *Seibert, Elstad* controlled when addressing *Miranda* warning violations and the corresponding confessions. In *Elstad,* a suspect spoke a single incriminating sentence at his home.[11] *Elstad,* 470 U.S. at 301. Elstad had not received a *Miranda* warning before making the statement, apparently because the police officers did not believe that Elstad was in custody at the time of his statement. *Id.* Elstad was taken to the police station, where he received a proper warning, waived his *Miranda* rights, and made a second statement. *Id.* He later argued that the second statement should be suppressed because it stemmed from the unwarned first statement. *Id.* at 302. The Supreme Court held that, although a *Miranda* violation made the pre-*Miranda*-warning statement inadmissible, the warned statements could be introduced against the accused because, given the facts of the case, "neither the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence would be served by suppression." *Id.* at 308 (citing *Michigan v. Tucker*, 417 U.S. 433, 445 (1974)).

**ANALYSIS**

This Court has not recently directly addressed midstream *Miranda* warnings such as those

---

[11] The officer sat down with Elstad and asked him if he knew a person by the name of Gross, and he said that he did and added that he had heard that there was a robbery at the Gross house. At that point, the officer told Elstad that he felt that Elstad was involved in the robbery. Elstad looked at him and stated, "Yes, I was there."

given in this case, but before *Seibert,* in *Jones v. State,* 119 S.W.3d 766 (Tex. Crim. App. 2003), we addressed facts similar to those presented here. Before receiving *Miranda* warnings, Jones orally admitted his involvement in two murders. *Id.* at 771-72. An officer wrote down the defendant's confession "verbatim" on a statement form. *Id.* After the first confession, the officer read the defendant the *Miranda* warnings that appeared at the top of the written form. *Id.* The officer and defendant read the statement simultaneously, then the defendant corrected mistakes, initialed revisions, and signed the statement at the bottom. *Id.* We declined to apply *Elstad*, stating that,

> in contrast to *Elstad*, where the initial unwarned statement took place at the defendant's home and the warned statement was given after transporting the defendant to the police station, the unwarned and warned statements in this case were given during a nearly undifferentiated single event, taking place in the same room as an uninterrupted and continuous process. The written statement [taken by Texas Ranger Akin] was literally a transcription of appellant's unwarned oral statement after he finally received his *Miranda* warnings; he simply signed the written statement that he had dictated to [the police officer] before he was warned. To apply *Elstad* here and declare the [second] statement admissible by virtue of the late admonishment of the required warnings would undermine the spirit and intent of *Miranda*. The waiver of rights given in connection with the [second] statement was not constitutionally valid in light of the circumstances and entire course of police conduct.

*Jones,* 119 S.W.3d at 775. The *Jones* Court held that the second statement was inadmissible, but found that the error in admitting it was harmless beyond a reasonable doubt.

Here, the pertinent facts are undisputed: (1) appellant was in custody and under arrest for capital murder; (2) Officer Sosa did not give appellant *Miranda* warnings at the time of his arrest; (3) Officers Sosa and Hernandez questioned appellant about the crime at the police station without giving the required warnings;[12] (4) appellant did not receive *Miranda* warnings before being taken

---

[12] During cross-examination at the hearing on appellant's motion to suppress, Officer Sosa twice conceded that he failed to give appellant his proper warnings.

for a polygraph examination;[13] (4) the identity of the polygrapher and the polygraph-examination questions are not included in the trial or appellate record;[14] and (6) a magistrate read the *Miranda* warnings to appellant only after both the first round of interrogation and the polygraph examination. Based on these facts, we have determined that "the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning . . .." *Seibert* at 621 (Kennedy, J., concurring).

The parties assert contrary positions as to the completeness and detail of the questions and answers in the first round of interrogation. Appellant contends that the court of appeals misapplied the *Seibert* factors by failing to place the burden of proof on the state to satisfy the five factors, including the questions from the first interrogation, and that it was the state's burden to show what questions were used during the polygraph examination.

The state contends that appellant has the burden of producing an adequate record and that he has failed to develop the record concerning what specific questions were asked during the polygraph

---

[Defense]: When you got down to [the police station,] what's the first thing you do?

[Officer Sosa]: We got to the [police station]. I gathered the case file information together so I'd have it at my disposal. I advised him of why he was arrested again and I asked him if he thought that he might want to speak with us....

[Defense]: Had you read [appellant] his rights at that time?

[Officer Sosa]: Had I read him–I hadn't read him his rights at that time, no.

* * *

[Defense]: Up until the time [you all] were going to the magistrate, you had not advised [appellant] that he had any of the rights that you later gave him on the videotape?

[Officer Sosa]: I did not read him his rights formally, no.

[13] There is no testimony in the record that appellant was told at any time that he could refuse to take the polygraph examination.

[14] In the motion for new trial, appellant's counsel alleged that the state obtained the name of the polygrapher by calling the police department, but withheld this information until after trial began.

examination and any of the unwarned conversations. *See Ortiz v. State,* 144 S.W.3d 225 (Tex. App.–Houston [14th Dist.] 2004, pet. ref'd) (stating that repeal of former rule (Rule 50(d)) of appellate procedure does not absolve appellant of his burden of presenting a record to show error requiring reversal insofar as he is required to develop record to show nature and source of an error).

The court of appeals took the same position, asserting that appellant did not submit an adequate record regarding the unwarned statements and questions asked during the polygraph examination. It stated that

> at the outset, we note that there is no record of Martinez's pre-warning statements made to Officers Sosa and Hernandez or the polygraph examiner. The first two factors that the *Seibert* plurality found relevant in determining whether *Miranda* warnings delivered midstream are effective are the completeness and detail of the questions and answers in the first round of interrogation and the overlapping content of the two statements. The dissent is troubled by Martinez's two references to the polygrapher telling him that three people were shot during the incident. Unlike *Seibert*, Martinez was repeating the polygrapher's general statements regarding the crime, not his own unwarned statements. Therefore, the first two *Seibert* factors are not applicable in Martinez's case.

*Martinez*, 204 S.W.3d at 921. Indeed, the record is lacking; it does not contain a complete, or even partial, description of the questions and answers in the first round of interrogation and polygraph test. Even so, this does not preclude analysis.

The state, as the proponent of the evidence of appellant's confession, bears the burden of establishing its admissibility. TEX. RULES EVID. 104(a). *See also De la Paz v. State*, ___ S.W.3d ___, 2008 Tex. Crim. App. LEXIS 751, at *26-27 (Tex. Crim. App. 2008); *Cofield v. State*, 891 S.W.2d 952, 954 (Tex. Crim. App. 1994). Further, we have long held that the prosecution bears the burden of proving admissibility when a *Miranda* violation is found. *See, e.g., Creager v. State,* 952 S.W.2d 852, 860 (Tex. Crim. App. 1997)*; Alvarado v. State,* 912 S.W.2d 199, 211 (Tex. Crim. App.

1995) (quoting *Colorado v. Connelly*, 479 U.S. 157 (1986)). When the officers initially questioned appellant at the police station without giving him *Miranda* warnings, they violated appellant's constitutional rights. At the suppression hearing, the state failed to provide the polygrapher's name, the questions used during the polygraph examination, or the content of the initial interrogation of appellant, all of which are under the exclusive control of the state.

The state also asserts that this case is distinguishable from *Seibert* because there is no evidence that appellant made any incriminating statements before he was given his *Miranda* warnings. We agree with Justice Kennedy (and the plurality in *Seibert*) that "not every violation of [*Miranda*] requires suppression of the evidence obtained. Evidence is admissible when the central concerns of *Miranda* are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction." *Seibert* at 618-19 (Kennedy, J., concurring). In some cases, an officer might not recognize that a suspect is in custody and that warnings are therefore required. We also agree that the suppression of warned statements under such a circumstance would serve "neither the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence." *Elstad*, 470 U.S. at 308. Indeed, *Elstad* provides a practical approach to enforcing *Miranda* protections. "[A] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318. Contrary to *Elstad*, however, a *Miranda* warning given midstream, as in this case, requires a closer examination of the investigatory techniques used before and after *Miranda* warnings are given.

When a question-first interrogation begins, it cannot be known whether the suspect will incriminate himself, but the suspect's rights as set out in *Miranda* have already been violated.

Although both *Elstad* and *Seibert* involved incriminating statements in the first interrogation that were repeated in the second, that was not the focus of the holdings. In both cases, the prime concern was the constitutional rights that the *Miranda* decision was intended to protect. *Seibert* at 611, 619, 621 (whether warnings could function effectively, as *Miranda* requires (plurality); "whether admission of the evidence under the circumstances would frustrate *Miranda*'s central concern and objectives"; whether the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning (Kennedy, J., concurring)). It is immaterial to our consideration whether incriminating statements emerged from the unwarned interrogation.

Here, appellant was in custody for the purposes of *Miranda*; he gave both statements to law-enforcement officials after his formal arrest pursuant to an arrest warrant, and both statements were given at a police station.[15] This indicates that the absence of *Miranda* warnings at the beginning of the interrogation process was not a mistake based on the interrogating officers' mistaken belief that appellant was not in custody, but rather a conscious choice.[16]

The state challenges the court of appeals's finding of continuity of police personnel, arguing that there was a "substantial break" between the two statements; and that, therefore, the interrogation was not continuous. The record does not support this argument.[17]

---

[15] Officer Sosa testified that the first interrogation took place at 1200 Travis and the second interrogation took place at 61 Reisner, the central holding area.

[16] *The Seibert* plurality articulated that intent is not the dispositive factor in determining whether an officer used the question-first strategy "because the intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation); the focus is on facts apart from intent that show the question-first tactic at work." *Seibert* at 616.

[17] The *Seibert* plurality stated that "it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle." *Seibert* at 614. "As Justice Souter points out, the two-step technique permits the accused to conclude that the right not to respond did not exist when the earlier incriminating statements were made. The strategy is based on the assumption that *Miranda* warnings will tend to

The interrogation process was lengthy. Officer Sosa testified that he arrested appellant midmorning and that he and Officer Hernandez first questioned appellant regarding the case around 10:00 a.m. Shortly after the first interrogation ended, appellant was taken to the polygrapher and given a polygraph examination, which took three to four hours. Immediately following the polygraph examination, appellant was taken to the municipal court, where a magistrate administered *Miranda* warnings at approximately 5:00 p.m., seven hours after the first questioning. After being arraigned, appellant was returned to the central holding station and gave his videotaped, warned, second statement at approximately 5:15 p.m.[18]

Determining whether a suspect was in the continuous presence of police personnel cannot be accomplished by focusing on only the lapse of time between the two statements; it is determined by considering all of the events that occurred between the unwarned statement and warned statement. Throughout the day of his arrest on this charge, appellant was with police officers or other police department personnel or detained in a police facility. The same officers conducted the first and second periods of questioning, and aside from the time during which the polygraph test was administered by another police officer, they were both continuously with appellant. From arrest to questioning to polygraph to magistration to questioning, the presence of police personnel was uninterrupted. We discern no "substantial break in time and circumstances between the prewarning statement and the *Miranda* warning."

Appellant asserts that the court of appeals erred in failing to consider that Officers Sosa and

---

mean less when recited mid-interrogation, after inculpatory statements have already been obtained." Seibert at 620 (Kennedy, J., concurring).

[18] Officer Sosa also testified that they fed appellant at some point during the day, and that appellant was allowed to call his father and girlfriend, but Officer Sosa could not give a specific time.

Hernandez did not tell him that all of the prior questioning was improper and that it could not be used against him. The state argues that appellant was properly warned of his rights and waived them before giving his videotaped statement.

It is evident that the officers treated the videotaped interrogation as a continuation of the first; as in *Siebert*, at the beginning of the second interrogation, Officer Sosa referred to the first interrogation and restated what he had told appellant during the first interview.[19] While the questions and answers from the first round of interrogation are not in the record, we can conclude from Officer Sosa's reference to the first interrogation that appellant could reasonably assume that a continuity existed between the two interrogations.

On the video, Officer Sosa began by reading the *Miranda* warnings to appellant. He then asked appellant if he understood his rights, and appellant replied affirmatively. Both officers, however, failed to inform appellant that, based on the lack of *Miranda* warnings, any prior statement made during a previous interrogation, including the polygraph exam, could be not used against him.

The polygraph test, in and of itself, poses great concern. Before taking the polygraph, appellant denied knowing about the crime. Officer Sosa failed to inform appellant that he could refuse to take the polygraph test or that, after starting the test, he could stop at any time. *See generally* TEX. CODE CRIM. PROC. art. 15.051. At the conclusion of the test, Officer Sosa informed appellant that he had "failed" the test without indicating that the results showed deception as to some answers, nor did he tell appellant which questions appellant had answered deceptively. As

---

[19] [Officer Sosa]: Remember, I told you that I'm not going to yank your chain; [that] I'm not going to bull [s]h** around?

[Appellant]: Yeah.

previously noted, the polygraph examiner, and the facts learned by appellant from the polygraph examiner, were mentioned by appellant and the officers in the video. It has long been the rule in this state that references to a polygraph test, or to its results, are inadmissible for all purposes. *See Nesbit v. State* 227 S.W.3d 64, 66 (Tex. Crim. App. 2007) (quoting *Nethery v. State*, 692 S.W.2d 686, 700 (Tex. Crim. App. 1985)). Hence, the officers had the responsibility to inform appellant that the questions asked during polygraph test, or the test results, could not be used at trial and that any mention of the test at trial was likewise prohibited. This, coupled with the fact that the officers initiated the conversation regarding the first interrogation, likely created the belief in appellant's mind that he was compelled to again discuss the matters raised in the first interview during the second interview.[20]

If the deliberate two-step strategy has been used, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Seibert* at 619 (Kennedy, J., concurring). We agree that

---

[20] The *Seibert* plurality emphasized that

> [i]t seems highly unlikely that a suspect could retain any such understanding when the interrogator leads him a second time through a line of questioning the suspect has already answered fully. The point is not that a later unknowing or involuntary confession cancels out an earlier, adequate warning; the point is that the warning is unlikely to be effective in the question-first sequence we have described.

*Seibert* at 614 n.5.

Justice Kennedy noted that

> [t]he technique used in this case distorts the meaning of *Miranda* and furthers no legitimate countervailing interest. The *Miranda* rule would be frustrated were we to allow police to undermine its meaning and effect. The technique simply creates too high a risk that postwarning statements will be obtained when a suspect was deprived of "knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran v. Burbine*, 475, U.S. 412, 423-24 . . . (1986).

*Seibert* at 621 (Kennedy, J., concurring).

"curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.* Examples of appropriate curative measures include: (1) a substantial break in time and circumstances between the unwarned statement and the *Miranda* warning (Kennedy);[21] (2) explaining to the defendant that the unwarned statements, taken while in custody, are likely inadmissible (Kennedy); (3) informing the suspect that, although he previously gave incriminating information, he is not obligated to repeat it (plurality); (4) the interrogating officers refrain from referring to the unwarned statement unless the defendant refers to it first (plurality); or (5) if the defendant does refer to the pre-*Miranda* statement, the interrogating officer states that the defendant is not obligated to discuss the content of the first statement (plurality).[22] No curative steps were taken in this case.

The officers had the responsibility of applying curative measures at the beginning of the second interview, or, at the very least, when they referred to the first interrogation of appellant. They did neither. Such omissions or actions are not likely "to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Seibert* at 622 (Kennedy, J., concurring). Curative measures allow the accused "to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id*.

In this case, the officers did not apprise appellant of his *Miranda* rights when they began custodial interrogation and failed to apply any curative measures in order to ameliorate the harm caused by the *Miranda* violation. Appellant's videotaped statement was therefore inadmissible. We

---

[21] The state's assertion must also fail because the polygraph test, which was not completed until approximately 4:30 p.m., was an integral part of the unwarned statement. Less than an hour after the polygraph test ended, police began the second interrogation process, thereby leaving an insubstantial break between the two interrogations.

[22] These examples are nonexclusive, but they provide guidance as to when curative measures are needed.

reverse the judgment of the court of appeals and remand this cause to the court of appeals so that it may conduct a harm analysis.

Delivered: December 17, 2008
Publish